JOHN D. GIBSON and MARTHA GIBSON,

Complainants below, Appellants,

*vs.*

CHARLES MAIN,

Defendant below, Appellee.

*Supreme Court, on Appeal, Jan. 22, 1925.*

Restrictions in deed are construed most strongly against grantor and any doubt as to meaning of restriction is resolved in favor of grantee.

In deciding meaning of restricting words·in deed, grantor's intention governs, and may be ascertained from restricting words themselves, or from those words in connection with other words in deed.

In determining meaning of restricting words in deed, common and ordinary words must be given meaning that they are ordinarily understood to have.

Deed prohibiting "any slaughter house, piggery, smith-shop, forge, furnace, foundry or any other factory of any kind whatsoever, or any brewery, distillery or any other noxious trade or business, and * * * any stores or garages" *held* to prohibit garages of any kind except private garages used in connection with residence on particular lot.

APPEAL FROM COURT OF CHANCERY. From a decree entered in accordance with the opinion of the Chancellor reported *ante. p.* 112, the complainants below appealed to the Supreme Court. The facts and contentions of solicitors appear in the report of the case below.

PENNEWILL, C. J., and RICE, HARRINGTON, RICHARDS, and RODNEY, J. J., sitting.

*H. Eugene Savery* and *Robert G. Harman*, for the appellants.

*Aaron Finger*, for the appellee.

PENNEWILL, C. J., delivering the opinion of the Court:

This is an appeal from a decree of the Chancellor.

The facts in the case, as well as the contentions of counsel, and the cases cited, are so fully and clearly stated in the Chancellor's opinion, *ante p.* 112, it is deemed unnecessary to restate them here. And, moreover, it is not the purpose of this court to reverse the decree of the Chancellor, but only to modify to some extent the language of his opinion.

The restriction clause in the deed to defendant is as follows:

"That the purchaser shall not and will not at any time hereafter, erect or permit any building within twenty feet of the building line of any of said lots or parcels of land, and will not erect or permit upon any part of said lots, hereinbefore described, any frame buildings, or any buildings without roofs of slate or metal or other fireproof materials, or any slaughter house, piggery, smith-shop, forge, furnace, foundry or any other factory of any kind whatsoever, or any brewery, distillery or any other noxious or dangerous trade or business, and will not erect nor permit, during a period of twenty years * * * any stores or garages upon said lands."

There could be no doubt about what the grantor meant by the word "garages," if the concluding restriction stood alone, that is, if there were no other restrictions in the deed, because the word garages taken by itself covers, of course, garages of every kind. But the restriction respecting stores and garages is one of several restrictions contained in the deed, and they may be considered in determining whether the grantor intended to prevent the erection of private garages as well as those of a public character.

There are two principles of law more or less applicable to the present case that are not disputed, viz.:

1. That restrictions in a deed are to be taken most strongly against the grantor, and where the meaning of a restriction is doubtful, the doubt shall be resolved in favor of the grantee.

2. In deciding what is meant by restricting words the intention of the grantor must govern, and such intention may be ascertained from the restricting words themselves, or from those words taken in connection with other words in the deed.

Another principle of law equally well settled is, that common and ordinary words must be given the meaning that they are ordinarily understood to have.

The application of the last principle would compel the conclusion, that by the word "garages" the grantor meant both pub-

lic and private garages, unless there is some other language that clearly indicates a different meaning in the mind of the grantor.

Is there any such language in the deed?

Manifestly the principal thought and clear intention in the mind of the grantor, was that the lands conveyed should be safe and desirable for residential purposes. It is difficult to conceive, therefore, that the grantor meant to make any restriction that would detract from such purposes. For twenty years at least it was intended that the lands should not be used for any other purposes. There can be no doubt that now, and at the time the deed was made, the prevention of the erection of a private garage on a lot of land intended for residential purposes would make the lot less desirable for such purposes. It is true that the court are not concerned with the effect of the restriction, whatever it may be. The grantor had a right to prevent the erection of any private garage, if he chose to do so, and the court are bound to enforce the right, if such was his intention.

When the restrictions are considered as a whole, it is manifest that the grantor sought to effectuate his purpose: (1) By preventing the erection of any building very close to the building line, or any building that would be unusually liable to destruction by fire; (2) by preventing the erection of any building to be used in the conduct of a business that would be offensive to other landowners; (3) by preventing the erection of any building to be used in the mercantile business. Such business, while not necessarily dangerous or offensive, might nevertheless make the other lands less desirable for private residences on account of the public character thereof; and (4) by preventing the erection of garages generally. But did the grantor intend to prevent the erection of a private garage to be used in connection with a residence, either erected or about to be erected on the particular lot? We think not. To so hold would be inconsistent with the grantor's main purpose, because it would make the land less desirable for a private residence at a time when a private garage is regarded as almost essential to the comfort and convenience of a home. But even private garages might be objectionable under certain conditions. For example, a lot might be occupied entirely by such garages and no residence erected thereon at all. If the purchaser should be per-

mitted to build a garage, or garages, to be used in connection with residences erected in the particular locality, but on lots other than this particular one, such a situation would be inconsistent with the grantor's intention, and would likely prove very annoying to the other residents for whose protection the restrictions were in all probability made, and possibly damaging to their property. So it is reasonable to assume that the meaning of the restriction as to garages was that no garage of any kind should be built unless it was to be used in connection with a residence built or to be built on the particular lot. A private garage entirely independent of a residence on the lot would be inconsistent with the intention of the grantor.

The defendant below testified before the Chancellor that it was his intention to build a bungalow on the lot, and if he should consummate this intention he would, under our holding, be entitled to use garages erected on the lot in connection with such residence. Such being the defendant's stated intention, a restraining order should not be made preventing the erection of a garage on the premises.

We, therefore, are of the opinion that the decree of the Chancellor, made on the twenty-seventh day of July, A. D. 1923, dismissing the bill of complaint, should be and it is hereby affirmed.

RICE, RICHARDS, and RODNEY, JJ., concurring.

HARRINGTON, J., delivering a minority opinion:

The covenant to be construed was first inserted in a deed from the Liberty Land Company to the Wilmington Housing Company, dated February 28, 1921. This deed conveyed six unimproved lots of which the lot belonging to Main, the respondent below, the appellee, is one. The same covenant was also inserted in the subsequent conveyance of the same lot, including the deed conveying title to Main; the majority opinion sets out this covenant in full, consequently for the sake of brevity I will not repeat it here.

After Main had acquired title he started to erect a garage on his lot; which said garage was to be used for private purposes only but in connection with two dwelling houses owned by him on lots adjoining the garage lot but facing on another street.

The bill filed in this case raises the question whether the erection of such a garage is prohibited by the covenant above referred to. While a covenant is usually construed most strongly in favor of the grantee and against the grantor (*Beckwith v. Pirung, et al.*, 134 *App. Div.* 608, 119 *N. Y. S.* 444; *Smyth v. McCarroll*, ʼ76 *Pa. Super. Ct.* 142), like all other contracts its meaning depends upon the intention of the parties to the deed in which it is inserted. *Berry on Restrictions on Use of Real Property*, §§ 34 and 35. Such intention must ordinarily be ascertained from the language of the deed itself, but where its terms are ambigous and uncertain the surrounding facts and circumstances may also be considered not in any sense, however, to add to or take from such instrument, but merely to aid in the interpretation of the language used by the parties themselves. *Williston on Contracts*, § 629; 22 *C. J. p.* 1189.

The same general principle was applied in *Wright, et al., v. Scotten*, 13 *Del. Ch.* 402, 412, and 413, 121 *Atl.*, 69, 31 *A. L. R.* 1162, *Foreman's Systems, Inc., v. Milk Dealers' Crate Corp.*, 13 *Del. Ch.* 351, 361, and 362, 120 *Atl.* 358, and in *Penn Co. v. W. M. Q. Co.*, 1 *Pennewill*, 337, 41 *Atl.* 236.

The covenant in question prohibits the erection on the lot belonging to Main of any building without roofs of slate or metal or other fireproof materials; of any slaughter house, piggery, smith-shop, forge, furnace, foundry or any other factory of any kind, whatsoever, or any brewery, distillery or any other noxious; or dangerous trade or business; and for the period of twenty years, of any stores or garages.

It will be noticed that no buildings, other than the ones above enumerated, are expressly prohibited by it. In addition to fixing the building line and prohibiting the erection of garages, the restrictions may be divided into the three following more or less clearly defined classes. Those intended to decrease the risk of fire; those intended to prevent the erection of any building to be used in conducting any business or trade that would be offensive, noxious or dangerous, and by reason thereof be a nuisance to other property owners, and those intended to prevent the erection of any building to be used in the mercantile business.

It is true that the word "garages" standing alone is a general

term broad enough to cover both public and private garages, but with the exception of the clause fixing the building line and the clause intended to decrease the risk of fire, this word is used in connection with prohibitions relating to certain kinds of business, trade or industry of a public or semipublic nature.

With respect to the construction of contracts, *Williston on Contracts*, § 619, uses the following apt language:

"Therefore, where there is a repugnancy between general clauses and specific ones, the latter will govern; and even if there is no actual repugnancy if the words of the contract are taken literally, yet when from the whole instrument it appears that the purpose of the parties was solely directed towards the particular matter to which the special clause or words relate the general words will be restrained  \*  \*  \*  ; and indeed it has been laid down broadly that general words in any contract, relating to a particular subject, shall be construed as meaning things of the same kind, as the particular matters referred to. But general words following an enumeration of particular things may include other things not *ejusdem generis* if such appears to have been the intention of the parties."

That this is a well settled rule of construction is clear. *Agar v. Atheneum Life Assurance Society*, 3 *C. B.* (*N. S.*) 725, 753; *Fisher Electric Co. v. Bath Iron Works*, 116 *Mich.* 293, 74 *N. W.* 493; *Smith's Estate*, 210 *Pa.* 604, 60 *Atl.* 225.

The Chancellor applied it in the court below and held that the covenant in question merely referred to garages intended to be used for trade or business or some *quasi* public purpose and that it, therefore, had no application whatever to mere private garages. In this connection he said:

"That the company of words in which the word garages is found indicates that it is meant to apply to such structures only as are identified with trade or business or some *quasi* public use."

I agree with this reasoning and with the conclusion based thereon (*Sullivan v. Sprung*, 170 *App. Div.* 237, 156 *N. Y. S.* 332), and the opinion of the majority of the Court is apparently based in part on the application of the same rule.

As I understand this opinion, it goes a step further than the court below, however, and holds that the covenant in the deed to Main not only prohibits the erection of a public garage but that it also prohibits the erection of a private garage, unless such pri-

vate garage is to be used in connection with a dwelling now erected or about to be erected on the same identical lot.

This distinction clearly does not appear from the express language of the covenant, standing alone, and as I view it, it does not appear by fair implication from such language. While the application of a well recognized rule of construction does seem logically to permit of a distinction, in the covenant to be construed, between a garage to be used for business purposes and a mere private garage, so far as this case is concerned, a classification of private garages into various kinds does not seem to be within either the spirit or the letter of the rule applied.

It is true that the reasoning of the majority opinion seems also based in part on the general conclusion that the intention of the grantor was to make the lands conveyed in Union Park Gardens safe and desirable for residential purposes. But admitting that, did the parties to the covenant intend to prohibit the erection of private garages of any kind as one of the means employed to carry out such intention and if so where is the expression of that intention to be found? That an intention, not expressed, cannot affect the meaning of the covenant, will be conceded.

As the covenant in the deed to Main, standing alone, contains no such distinction, either in plain language or by fair implication, I assume that the majority of the court base their construction of it on reading it in connection with the surrounding facts and circumstances. They, however, do not point out what these particular facts are.

It is true that the Chancellor found that the locality in which the lot, belonging to Main, is situated was developed as a purely residential section, and this conclusion is clearly supported by the record.

In this connection Mr. Kurtz testified that:

"We tried to make it (Union Park Gardens) a very beautiful place and toward the end when the adjustment came between the Liberty Land Company and the Wilmington Housing Company we began talking about restrictions—that we would like to keep the place a very pretty place and not hampered by buildings that probably wouldn't be in conformity with and would deteriorate the value" of other property.

Mr. Kurtz further testified that the "neighborhood surrounding" the garage which Main had started to erect on his lot consisted of "dwelling houses" and that "the primary intention of the incorporators of the Liberty Land Company was to make this a residential neighborhood."

The record also shows that the particular lot affected by this covenant was situated in Union Park Gardens. I have not been able to find any other facts in the record having any apparent bearing on the question involved from the standpoint of the majority of the court. However desirable it may be, at times, to do otherwise, this court must take contracts as it finds them. While it may have been the intention of all parties to make Union Park Gardens a "residential neighborhood"; "a very beautiful place, not hampered by buildings that would not be in conformity with and would deteriorate the value" of other property located therein, I am unable to see how that justifies so construing the terms of the covenant in question as to include within its prohibitions all public garages but only a limited class of private garages.

I can readily understand how the *ejusdem generis* rule could be rejected with respect to its application to this case and the covenant be construed to prohibit the erection of all garages, but having adopted that rule in limiting the meaning of the general term "garages" it seems to me that the only logical conclusion is that the sole distinction made is between private garages and garages intended to be used for business purposes.

I, therefore, concur with the majority of the court in affirming the decree of the court below, but I am unable to agree with their modification of the opinion on which the decree of that court was based.