The STATE of Delaware, Upon the Relation of the DEPARTMENT OF TRANSPORTATION, Plaintiff,

v.

The PENN CENTRAL CORPORATION, a corporation of the Commonwealth of Pennsylvania, et al., and Unknown Others, Defendants.

Superior Court of Delaware, Sussex County.

Submitted Oct. 26, 1981.

Decided March 31, 1982.

Aubrey B. Lank, William S. Gee (argued), and David Lank (argued), of Theisen, Lank, Mulford & Goldberg, Wilmington, for the State of Delaware.

Eduard F. vonWettberg, III, and Edward M. McNally (argued), of Morris, James, Hitchens & Williams, Wilmington, for the Penn Central Corp. and Philadelphia, B. & W. R. R.

TAYLOR, Judge.

This is an action by the State of Delaware upon the relation of the Department of Transportation [plaintiff] against Penn Central Corporation [Penn Central] and approximately 350 individual defendants to acquire by eminent domain the fee simple absolute title to a strip of land together with rails, ties, ballasts and bridges running approximately 16.1 miles from Georgetown, Delaware to Lewes Beach, Delaware which has been used for a railroad line. The central question is whether and to whom compensation must be paid as a result of the taking of the land. Plaintiff concedes that Penn Central is entitled to compensation for the rails, ties, ballasts and bridges and has agreed to the distribution to Penn Central of the sum of $251,787, the amount of plaintiff's estimate of the value thereof.

Penn Central is the successor of the Junction and Breakwater Railroad Company [Railroad] which was formed February 13, 1857 by act of incorporation, 11 Del.Laws Ch. 354. Railroad acquired title or rights in the land involved in this condemnation by deed, condemnation, and agreement extending as late as 1915 involving approximately 80 parcels. Because of the diverse means of acquisition, the Court will consider separately the rights acquired by the Railroad under each category.

## I. A.

Railroad's rights in approximately 31 parcels were acquired by Railroad by condemnation. The Act which incorporated the Railroad, 11 Del.Laws Ch. 354, provided "whenever any land, earth, sand, gravel or other materials necessary to be taken and used in the construction of the said railroad, cannot be procured or purchased of the owner thereof, by agreement between him and the company," the Superior Court, upon application of the Railroad, would appoint freeholders "to view the premises and assess the damages, which the owner or owners will sustain by reason of the railroad passing through or taking or using the same." (§ 11). It further provided that upon payment of the assessed damages "the title to the land and premises described and condemned in said report, for the purposes aforesaid, shall be absolutely vested in the said company, their successors and assigns." It further provided that prior to final resolution of the amount of damages, the Railroad may pay into court the amount award-

ed by the freeholders[1] and thereupon "it shall be lawful for the said company to enter upon the lands therein condemned, without further delay, and to use and occupy the same for the purposes aforesaid ..."

Penn Central contends that its rights are determined by the language which states that "title to the land ... shall be absolutely vested in said company". Plaintiff points to the quoted portions which make reference to the use and occupancy of the condemned land "for the purposes aforesaid" and points out that that phrase immediately precedes the absolute vesting language relied upon by Penn Central. It is significant that each reference to the title and use which Railroad would acquire under its exercise of eminent domain is accompanied by the words "for the purposes aforesaid".

The Delaware decision which provides insight into the effect of statutory phraseology such as that found here is *Thomison v. Hillcrest Athletic Ass'n*, Del.Super., 5 A.2d 236 (1939). In *Thomison* this Court considered whether land which had been acquired by eminent domain under a school statute, 21 *Del.C.* Ch. 67, was held in fee simple or whether the condemnation proceeding had acquired only the right to use the land for school purposes. Judge Rodney, a scholar of Delaware legal history, sitting with Judge Speakman in this Court, considered the scope of a condemnation statute authorizing condemnation for school purposes. That statute, like the statute under consideration here, provided that upon payment of the damages "the said land so taken shall become and be the property of the [condemning party] for the purpose aforesaid". The *Thomison* Court considered the effect of the words "for the purpose aforesaid" upon the general statement "that the said land so taken shall become and be the property of the said school district" and held that this was a limiting phrase which prevented the acquisition of fee simple title by condemnation,

since the objective of the statute was to provide for the acquisition of rights necessary to carry out the objective of the statute, namely, to conduct a school and that providing a school did not require fee simple title.

This Court in *Thomison* also relied on the historic consideration that condemnation can be exercised only for a public use and that, at least where qualifying language is used, the statute should be strictly construed to assure that the property owner is not deprived of any right which was not required for that public use. The Court held that the rule of strict construction applies not only to the quantity of property to be taken but also to the quantum of the estate or interest to be taken.

Penn Central seeks to distinguish *Thomison* on the ground that Railroad had an unqualified power to purchase real estate and therefore the reasoning of *Thomison* should not limit its power of condemnation. However, an examination of the statute which authorized school committees to establish schools empowered the committee "to purchase the necessary ground". 21 *Del.Laws* Ch. 67 § 15. *Thomison* exemplifies the distinction which the law made at the time of Railroad's acquisitions between the power to purchase and the power to take by eminent domain.

I note in passing that the Court in *Thomison* commented that the same language involved in *Thomison* appeared in an earlier school law, 11 *Del.Laws* Ch. 442, which was enacted by the same General Assembly which enacted Railroad's statute, and the statutes were passed only 20 days apart. It must be assumed that the reference in each statute to the specific purpose for which the property was to be held was intended to produce a similar result.

I conclude that the eminent domain language of the school law considered in *Thomison* and that of Railroad's statute, although containing different phraseology, both contain the ingredient which *Thomison*

---

1. The Act provided that if a party was not satisfied with the award by the freeholders in the Superior Court, the matter could then be submitted to a Sheriff's jury whose determination would be final.

found controlling, namely, language tying the acquisition to the purpose of the acquisition. Therefore, under the reasoning of *Thomison*, Railroad did not acquire fee simple title by its condemnations.

According to an annotation appearing in 155 *A.L.R.* 381 et seq., the prevailing view in the 19th century was that a railroad right of way was normally only an easement. Thus, a presumption existed that a taking for railroad purposes did not deprive the private owner of fee simple title unless the language used in the taking clearly and expressly showed that the fee was being taken. Therefore, an authorization to condemn land for a specified purpose was limited to the acquisition of the interest necessary to accomplish the purpose stated, and even if the statute conferred the power to acquire fee simple title the condemnation proceeding must expressly show an intention to acquire all of the title interests. Ibid. 26 *Am.Jur.2d* Eminent Domain § 137, pp. 798–800. The principle discussed above is recognized in 5A *Thompson on Real Property* § 2581, p. 187 and 3 *Nichols on Eminent Domain* § 11.1.

The material provided to the Court from the condemnation proceedings does not describe the land rights which the Railroad purported to acquire in the condemnation. However, the condemnation award judgments which were entered in favor of the property owners generally provided that the award represented the damages:

> which the said owner will sustain by reason of said railroad passing through, using and occupying (for the purpose of making said railroad,) a portion of said lands upon which the said railroad is located, to wit ... (followed by a description which referred to the center line of the railroad and a width of 66 feet).

This not only makes no mention of the acquisition of fee simple title to the strip of land, but instead it compensates for damages sustained by reason of the railroad "passing through, using and occupying (for the purposes of making said Railroad,)". Therefore, the condemnation papers do not overcome the presumption that the condemnation was only to procure a railroad right of way and not fee simple title.

The case of *Vandergrift v. The Delaware R. R. Co.*, Del.Super., 2 Hous. 287 (1860) is of interest. It arose three years after the incorporation of Railroad and a few years before Railroad's acquisitions. The statute which authorized Delaware Railroad to exercise eminent domain provided that upon payment of the award it would be "entitled to have, use and enjoy the said lands for the purposes by them required forever". The issue was whether Delaware Railroad had a duty to fence its tracks. A statute required an owner of land to construct a division fence. Delaware Railroad's attorney, James A. Bayard, Esquire, and plaintiff's attorney, George B. Rodney, Esquire, both argued that Delaware Railroad which had acquired the area by condemnation merely had a right of way and was not the owner of the land where the tracks were located. The unanimity in this case which was participated in by prominent Delaware lawyers indicates the view which was held at the time concerning the legal effect of condemnation under statutory language not greatly dissimilar from the authorization under which Railroad operated in these acquisitions.

Based on the considerations discussed above, I conclude that Railroad acquired the right to use the land which was the subject of condemnation proceedings for railroad purposes for an unlimited period, but that it did not acquire fee simple absolute title to that land.

### B.

■ Many acquisitions by Railroad were obtained through agreements. Plaintiff and Penn Central are agreed that the agreements between the owners and Railroad gave Railroad the same rights which Railroad would have acquired by its exercise of eminent domain since the agreements were reached under threat of condemnation by the Railroad. Cf. 30 *C.J.S.* Eminent Domain § 449, p. 627; *Fleck v. Universal-Cyclops Steel Corp.*, 397 Pa. 648, 156 A.2d 832 (1959); *Aubert v. St. Louis-*

*San Fr. R. Co.*, 207 Okl. 537, 251 P.2d 190, 191 (1952).

Applying the conclusion reached above, namely that the Railroad's rights acquired by condemnation did not encompass fee simple title, but were limited to the right to use the land for railroad purposes, I find that the rights conferred by agreements are of the same scope and limitation.

### C.

■ A portion of the land involves a deed from Edward and Mary R. Wootten to Railroad dated July 21, 1874. The deed covers a parcel of land and also a 66 feet wide "right of way for said ... Railroad". The parcel is not involved in this suit. The issue here is what interest Railroad acquired in the strip of land which is described in the deed as a right of way.

The usual formalities for a deed of that vintage which normally determined the effect of the deed are not in harmony in this deed. The purported conveyance of the railroad strip only refers to "right of way". The granting clause contains the traditional words without limitation.[2] However, the habendum clause contains the limitation, "for the uses and purposes of the said railroad only".[3]

■ The parties are agreed that intent of the parties when the instrument was executed should control, if it can be determined from the language of the instrument. *Lynch v. Bunting*, Del.Supr., 29 A.2d 155 (1942); *Penienskie v. Short*, Del.Super., 194 A. 409 (1937); *Daniels Gardens v. Hilyard*, Del. Ch., 49 A.2d 721 (1946).

A comparison of the two descriptions in this deed is helpful. The first description commences with the words "all that certain lot, piece or parcel of land", followed by a traditional metes and bounds description and ending with a statement of the square footages of that parcel. In contrast, the strip[4] is not characterized as a parcel of land; instead, it is referred to as a "right of way"; it is described as being "66 feet wide for the entire length of the land of the said Honorable Edward Wootten", without any metes and bounds description; its only other descriptive reference is that it was "now occupied by the said ... Railroad".

Traditionally, a deed for acquisition of a right of way for a railroad is considered to transfer all easement and not fee simple title. 65 *Am.Jur.2d* Railroads §§ 75–6, pp. 387–8. An annotation in 6 *A.L.R.3d* 1013 concludes that the general rule is that a deed to a railroad company which conveys a "right" or a "right of way" rather than a strip, piece, parcel or tract of land conveys an easement rather than a fee. In the same vane, 2 *Thompson on Real Property* (1980 ed.) § 381, p. 505 states that "[usually] a grant of right of way conveys only an easement".

Penn Central contends that because of conflicting provisions in this deed an ambiguity exists which requires that deed be construed to vest fee simple title and that any restrictions detracting from such title must be treated as covenants and not as conditions, citing *First Presbyterian Church of Wilmington v. Bailey*, Del. Ch., 97 A. 583 (1916), and *Delaware Land & Development Co. v. First and Central Presbyterian Church of Wilmington*, Del.Supr., 147 A. 165 (1928). These cases represent a highly technical and simplistic method of determining the rights which a deed conveys under which certain portions of a deed were attributed controlling significance over oth-

---

2. "grant, bargain, sell, alien, enfeoff, release, convey and confirm unto the said parties of the second part, their successors and assigns".

3. To have and to hold the lands and premises hereby bargained and sold or intended so to be with the appurtenances *for the uses and purposes of the said railroad only* (emphasis added) unto the said parties of the second part their successors and assigns to and for the only proper use, benefit and behoof of the said par-

ties of the second part their successors and assigns forever.

4. The pertinent language reads:

"Also, the right of way for said Junction & Breakwater Railroad 66 feet wide for the entire length of the land of the said Honorable Edward Wootten, Now Occupied by the said Junction and Breakwater Railroad."

er portions. A subsequent decision of the Supreme Court, *Lynch v. Bunting*, Del. Supr., 29 A.2d 155 (1942), adopted a more enlightened test under which the intent of the parties is determined from a consideration of the deed "as a whole rather than an aggregate of distinct parts".

In the present deed there are two strong indicia that the intent was to convey less than fee simple title. The first, as discussed above, is the reference to "right of way" as the subject of the conveyance. The second is the use of the words of limitation in the habendum clause "bargained and sold ... for the uses and purposes of the said Railroad only". These indicia of intent overcome any presumption that the deed conveyed fee simple title.

Penn Central places great weight upon language which follows the "right of way" language discussed above and describes accompanying supplemental benefits which accompany that conveyance.[5] This language traditionally appears in a conveyance of a parcel of land. Both the parcel description and the reference to the right of way precede this language. It refers to various things which may be pertinent to a parcel of land (buildings, ways, roads, and water courses) which were not pertinent to a railroad strip and it applies to those things "thereunto belonging or in any wise appertaining".

Penn Central points out the use of the words "all the estate" and contends that this shows an intent to convey the track strip.[6] The phrase in which those words appear ends with the words "every part and parcel thereof". The entire clause appropriately applies to a conveyance of land. Recognizing that the strip was being used for trackage, most of the language of the

clause is inappropriate to that strip. Undoubtedly it was inserted in conjunction with the conveyance of the described parcel. In any case, I do not find that its presence nullifies the effect of the indicia of intent discussed above.

Penn Central's contention that language of a deed should be construed most strongly against the grantor also falls in the face of the deed language discussed above, citing *Old Time Petroleum Co. v. Turcol*, Del. Ch., 156 A. 501 (1931); *McDermott v. Wilson*, Del. Ch., 174 A. 282 (1934); *Gibson v. Main*, Del.Supr., 129 A. 259 (1925), cited by Penn Central do not aid it because each of those cases involved unequivocal conveyance of a parcel of land upon which the grantor had imposed restrictions upon the use of the conveyed land. The issue here is whether the deed conveyed the land in fee simple. This case does not call for determining whether Penn Central's use of land which it held for fee simple should be restricted.

The cases cited by Penn Central in support of the proposition that language similar to that used in this deed conveys a fee simple absolute title do not support that conclusion. In each of the cited cases, *Rostell v. Arkansas & Ozarks Ry. Co.*, Ark. Supr., 230 Ark. 515, 323 S.W.2d 539 (1949); *Texas & P. Ry. v. Martin*, Tex.Supr., 123 Tex. 383, 71 S.W.2d 867 (1934), *cert. denied*, 293 U.S. 598, 55 S.Ct. 121, 79 L.Ed. 691 (1934); *Nashville, C. & S.L.R. Co. v. Bell*, Tenn.Supr., 162 Tenn. 661, 39 S.W.2d 1026 (1931); *Groce v. Southern Ry. Co.*, S.C. Supr., 164 S.C. 427, 162 S.E. 425 (1932); *Killgore v. Cabell County Court*, W.Va. Supr., 80 W.Va. 283, 92 S.E. 562 (1917); *Midkiff v. Castle & Cooke, Inc.*, Haw.Supr., 45 Haw. 409, 368 P.2d 887 (1962), the deed description referred to the conveyance of

---

5. "Together with all and singular, the buildings, improvement fixtures, ways, roads, water courses, rights, liberties, privileges, hereditaments and appurtenances whatsoever thereunto belonging or in any wise appertaining and the reversions and remainders, rents, issues and profits thereof and all the estate, right, title, interest, property, claim and demand whatsoever of them the said Edward Wootten and Mary R. Wootten his wife at law or in

equity of, to, in or out of the same and every part and parcel thereof." ·

6. *Comegys v. Vasse*, 26 U.S. 193, 218, 1 Pet. 193, 7 L.Ed. 108 (1828), cited by Penn Central dealt with language in a will and *Williams v. Heard*, 140 U.S. 529, 11 S.Ct. 885, 35 L.Ed. 550 (1891) cited by Penn Central held that a claim for war premiums was a vested right which passed by an assignment in bankruptcy.

land or property. None of the cases used the phrase right of way without a reference to land, as this deed does. Additionally, *Killgore v. Cabell County Court*, supra, rests upon the traditional distinction between the grant of a right of way and the grant of land.

The Court does not accept the contention that Railroad was not empowered to acquire fee simple absolute title by deed. 11 *Del.Laws* Ch. 354, sec. 2 granted such power to Railroad.

■ Applying the general principle that a grant of a right of way to a railroad company conveys only an easement and the limitation found in the habendum clause of the Wootten deed that the premises are "sold for the uses and purposes of the said railroad only", I conclude that 66 feet wide right of way granted to Railroad did not vest fee simple title thereto in Railroad.

### D.

■ The remaining area which requires separate consideration is the trackage strip which lies to the south and east of the Lewes-Rehoboth Canal. This area has a complex history which requires review.

In 1875 the General Assembly passed a statute, 15 *Del.Laws* Ch. 142, amending the Act which incorporated Railroad. The 1875 statute empowered Railroad "to extend their connection and railroad to and with the iron pier" located in the harbor of the Delaware breakwater.[7] Pursuant to the 1875 statute, Railroad plotted and occupied certain public land. By this statute Railroad had right to "use, occupy and enjoy" the land. But the statute omitted language indicating that Railroad had fee simple title or had the power to sell the land.

In 1907 an Act to re-incorporate the Town of Lewes, 24 *Del.Laws* Ch. 220, "vest-

ed" in the Commissioners of Lewes [Commissioners] certain vacant public lands in or contiguous to Lewes. That Act gave to the Commissioners "jurisdiction" over the lands and authorized the Commissioners to lease portions of the lands for such time and upon such terms as the Commissioners deemed proper. It did not authorize the Commissioners to sell or convey the lands.

A dispute over the impact of the Lewes charter provisions upon the land which Railroad had laid out pursuant to the 1875 statute resulted in the filing of an action in the Court of Chancery by the Commissioners of Lewes to obtain possession of the Railroad land. This was resolved by an agreement between the Commissioners of Lewes and Railroad dated March 8, 1915 whereby the Commissioners "remised, released and quitclaimed" certain land which Railroad had plotted and Railroad "remised, released and quitclaimed its interest, right, title claim and demand" to the remainder of the land which Railroad had plotted. The agreement was made contingent upon enactment of an Act by the General Assembly which approved the agreement. Ratification was accomplished by 28 *Del.Laws* Ch. 150.

The history which I have described is set forth as a preamble to the agreement. The objective of the agreement was to overcome the cloud which the Lewes re-incorporation Act (24 *Del.Laws* Ch. 220) had placed upon the rights which Railroad had acquired by the plotting of certain public land under the 1875 Act (15 *Del.Laws* Ch. 142). Legislative action was required in order to nullify the rights and powers which had been vested in the Commissioners which they were not authorized to relinquish or transfer.

■ Of the several ways in which this legislatively created conflict between the charter of Lewes and 15 *Del.Laws* Ch. 142

---

**7.** The Railroad was authorized to "locate and construct a railroad from such point or place on their railroad as they may deem expedient to the pier, with one or more tracks, and such sidings, depots, buildings and other structures as they may consider at any time necessary for the business of the Railroad" and "whenever it shall be necessary or expedient for [Railroad]

to enter upon or occupy any portion of the harbor of the Delaware breakwater or any land ... the property whereof is in this State, for the purposes, or any of them as aforesaid, it shall be lawful for them to enter upon the same and to hold, use, occupy and enjoy, so much thereof as may be necessary and proper therefor ...".

might have been resolved, the parties chose the device of a quitclaim agreement authenticated by legislative ratification. A quitclaim deed is one which purports to convey nothing more than the interest or estate in the property described which the grantor possesses, if any, rather than the property itself. 26 *C.J.S.* Deeds § 8, p. 592; *Greek Catholic Congregation v. Plummer*, Pa.Supr., 338 Pa. 373, 12 A.2d 435 (1940). It is a form of deed used when a party wishes to convey whatever interest he may think he has in land but does not wish to warrant title. 5B *Thompson on Real Property* § 2704, p. 313. The grantee of a quitclaim deed acquires no better interest than the grantor had. 23 *Am.Jur.2d* Deeds § 292, p. 324. Conversely, the grantee's acquisition is subject to all the limitations and disabilities of the grantor. Ibid.

It is noted above that the rights conferred by the reincorporation Acts included the exercise of jurisdiction and the power to lease portions of the land, but they did not include the power to transfer those rights or the power to dispose of the land. Thus, the rights transferred by the quitclaim were similarly restricted.

 Under the principle that a municipality is a creature of the State, a municipal corporation has no power except by express legislative grant or by fair and necessary implication, because of being incident to the powers expressly granted or essential to carrying them out. *Cutrona v. Mayor & Council of Wilmington*, Del.Supr., 127 A. 421 (1924). Except in instances of necessity, a power to convey municipal property will not be implied where the charter does not provide such power. *Drexler v. Com'rs of Town of Bethany Beach*, Del. Ch., 135 A. 484 (1926).

From the above analysis, the conclusion is that the Commissioners had no express or implied power to transfer title to the land. In recognition of this limitation they did not purport to transfer title. Instead, the Commissioners undertook to transfer only their right, title and interest in the land. Since they were not empowered to transfer even those rights, they made that transfer contingent upon legislative ratification "confirming the right of the said Railroad Company ... of entering upon, holding, using, occupying and enjoying the said lands."

The confirmatory Act's title [8] described the subject of the Act as ratifying, approving and confirming a certain agreement relative to certain lands near Lewes. The body of the Act ratified, approved and confirmed the agreement and the right of [Railroad] of entering upon, holding, using, occupying and enjoying the two tracts of land mentioned in said agreement. This description of Railroad's rights coincided with the description of rights which were conferred on Railroad under 15 *Del.Laws* Ch. 142. The Act did not purport to exercise the General Assembly's power to dispose of public lands, cf. *Trustees of New Castle Common v. Gordy*, Del.Supr., 93 A.2d 509 (1952); nor did it purport to enlarge the rights vested in the Commissioners with respect to the public lands nor did it purport to delegate to the Commissioners the power to dispose of such lands, ibid. At most it approved the Commissioners transfer of their rights in certain public lands to Railroad.

An extensive review of the history of the public lands in and around Lewes appears in *United States v. 1,010.8 Acres, etc.*, D.Del., 56 F.Supp. 120 (1944). It appears that a succession of legislative acts authorizing the Town of Lewes to exercise control over the public lands adjoining Lewes including the leasing of parcels were enacted beginning in 1871. 14 *Del.Laws* Ch. 126 (1871), 22 *Del.Laws* Ch. 199 (1901), 24 *Del.Laws* Ch. 220 (1907), 34 *Del.Laws* Ch. 144 (1928), 43 *Del.Laws* Ch. 170 (1941). The 1871 and 1901 Acts vested the public lands within the corporate limits of Lewes, and the 1907 and successive Acts vested the public lands within Lewes as well as the

8. The title of 28 *Del.Laws* Ch. 150 reads: An Act ratifying, approving and confirming a certain agreement executed by the Commissioners of Lewes and The Delaware, Maryland and Virginia Railroad Company, relative to certain lands near Lewes, Delaware.

public lands contiguous thereto and specified the powers of the Commissioners which I have discussed above.

At the conclusion of the historic review in *1010.8 Acres*, supra, Judge Leahy concluded that the fee simple title to the lands in question was in the State of Delaware, subject to a certain charitable use or trust for the benefit of the inhabitants of the Town of Lewes and County of Sussex and that the Commissioners of Lewes had been vested with full exclusive authority, control and jurisdiction over said lands, as trustee or agent designated by the State of Delaware. It should be noted in passing that *1010.8 Acres*, supra, was cited with approval by the Delaware Supreme Court in *Trustees of New Castle Common v. Gordy*, supra, in an Opinion written by Chief Justice Southerland, whose report on Special Master in *1010.8 Acres*, supra, was accepted with slight modification by Judge Leahy in *1010.8 Acres*.

The review and holding in *1010.8 Acres*, supra, confirm the conclusion that the General Assembly did not delegate to the Commissioners the power to convey fee simple title to the public land. *Trustees of New Castle Common v. Gordy*, Del.Supr., 93 A.2d 509 (1952) indicates that the General Assembly could divest or delegate the power to divest title to land acquired under a public trust. Cf. *Roe v. Town of Seaford*, Del.Supr., 80 A. 250 (1911). In view of the protective principles which surround such land, ibid, if legislative action is to be accorded such a result, the action must be in such form and in such language that the legislative action is clear. Neither the Acts relating to Lewes nor 15 *Del.Laws* Ch. 142 indicate a legislative purpose to divest title to such lands.[9]

In summary, I find that Railroad does not hold fee simple title to the public lands described in the agreement between the Commissioners of Lewes and Railroad, but that fee simple absolute title is in the State of Delaware, subject to the use rights provided for Railroad under said agreement and under 15 *Del.Laws* Ch. 142.

9. A similar conclusion was reached by the United States District Court for Delaware in

II

Plaintiff contends that Penn Central abandoned its right of way and therefore no Penn Central property rights are being taken by this exercise of eminent domain. This contention rests on Railroad's actions described hereafter.

On May 5, 1975 Penn Central petitioned the United States Railway Association for authority to abandon this line and notified the State of this application. On December 9, 1975 Penn Central gave the State Department of Highways and Transportation notices pursuant to § 304(a) of the Regional Rail Reorganization Act of 1973 "of their intention, effective February 27, 1976 to terminate all rail service" on the tracks constituting this railway. The notice further stated:

In the Final System Plan adopted under the terms of the 1973 statute the line to which this notice relates is not designated for continued operation of the Consolidated Rail Corporation or any other carrier.

By supplemental notice dated February 9, 1976, the date for termination of service was postponed to March 31, 1976. In order to avoid the discontinuance of the rail service, the State of Delaware entered into an agreement with the trustees of the property of Penn Central dated April 1, 1976 by which the State leased the lines, facilities, buildings and appurtenances. This agreement together with an extension thereof ran through December 28, 1979. This condemnation action was instituted December 2, 1978. Formal possession of the line by plaintiff was taken April 28, 1980.

The precise language used by the Penn Central trustees in this matter bears consideration. The petition addressed to the United States Railway Association on May 5, 1975 states "the trustees of Penn Central Transportation Company hereby petition . . . for authority to abandon the following lines of rail road . . ." The line which is the subject of this condemnation was one of

*Deakyne v. Department of Army*, D.Del., 530 F.Supp. 1322 (1982).

the lines listed in the May 5, 1975 petition. Copies of that petition were sent to the Governor of Delaware, Governor of Ohio, Governor of Pennsylvania, and the Public Service Commission of each of those States. The trustees' notice of December 9, 1975 to the Secretary of the Delaware Department of Highways and Transportation of their intention "to terminate all rail service on [designated lines] . . ." stated, "In the Final System Plan adopted . . . the line to which this notice relates is not designated for continued operation by Consolidated Rail Corporation or any other carrier." The same language was used in a supplemental notice by the trustees of Penn Central dated February 9, 1976 providing for a March 31, 1976 termination date. Notices dated April 12, 1977 "of their intention, effective on the date of cessation of service subsidized by the State of Delaware . . . to abandon [designated lines]". On December 3, 1979 Penn Central notified the Director of the Delaware Transportation Authority "with termination by the State of Delaware of its lease of the line as of December 28, 1979, Penn Central is notifying interested parties of its intention to abandon the line." And by a formal notice which accompanied that communication notice Penn Central stated "the Delaware Transportation Authority has served notice of the termination of its lease effective 11:59 p. m. December 27, 1979, and accordingly Penn Central will abandon the rail line as authorized by the Rail Act." Against this background, plaintiff took possession of the line pursuant to an Order of Possession entered in this condemnation on April 28, 1980.

Plaintiff contends that these actions of Penn Central constitute an abandonment of Penn Central's rights in the line, with the exception of the personal property located there.

■ Penn Central contends that this sequence of events is insufficient to constitute an abandonment of its railroad rights of way. It is correct, as Penn Central contends, that the burden of proving abandonment rests upon the party claiming that abandonment has occurred. *D. C. Transit*

*System, Inc. v. State Road Com'n of Md.*, Md.App., 265 Md. 622, 290 A.2d 807 (1972); Cf. *Wolfman v. Jablonski*, Del.Ch., 99 A.2d 494 (1933).

■ The principle is well established that the holder of a right of way or rights subject to limitation may be lost by abandonment. 95 *A.L.R.2d* 468 (1964); 65 *Am. Jur.2d* Railroads § 83, pp. 391–3. Abandonment depends upon a showing of (1) an intent to abandon and (2) some act or omission directed toward carrying out the intent to abandon. Ibid.

■ Several factors are needed to establish in Court that Railroad abandoned its rights to use the land in question for railroad purposes. The first is that the trustees had the power to cause an abandonment of Penn Central's property. The second matter focuses on the fact that the notices given by the trustees to the State refer to "abandon the following lines of railroad", "terminate all rail service" and "cessation of service". Technically, the issue here relates to abandonment of railroad right of way or right to use the subject land for railroad purposes. While abandonment does not depend upon the use of precise and technical language, the Court is called upon to make a determination based upon both the words used and the circumstances surrounding that use. To this end, the Court would require a showing of future plans, if any, held by the Railroad for the use, by itself or by others of the land, through contract or assignment, for railroad right of way or railroad purposes. I find the record lacking in these respects.

Since intent is an important element in determining whether abandonment has occurred, this is a subject which rarely lends itself to disposition on summary judgment. *Continental Oil Co. v. Petroleum, Inc.*, Del. Supr., 251 A.2d 824 (1969); *George v. Frank A. Robino, Inc.*, Del.Supr., 334 A.2d 223 (1975). Cf. 95 *A.L.R.2d* 468–470 (1964).

Accordingly, this issue is not in a posture to warrant a ruling upon the question of whether Penn Central has abandoned its rights in the disposition of this motion for

judgment. *Continental Oil Co. v. Petroleum, Inc.*, supra; *Sweetman v. Strescon Industries, Inc.*, Del.Super., 389 A.2d 1319 (1978); *Ebersole v. Lowengrub*, Del.Supr., 180 A.2d 467 (1962). Therefore, the Court makes no ruling at this stage on plaintiff's contention that Penn Central is not entitled to any compensation for its rights.

### III

In summary, Penn Central does not have fee simple absolute title to any of the land which is the subject of this condemnation proceeding. With respect to that issue partial summary judgment is granted in favor of plaintiff and against Penn Central.

The issue of abandonment of Penn Central's rights cannot be resolved at this stage. With respect to that issue both motions for summary judgment are denied.

The rights of any defendant other than Penn Central are not resolved at this stage except as they may be affected by the decision concerning Penn Central's rights.

IT IS SO ORDERED.