The Morris and Essex Mutual Coal Company, Appellant, v. Delaware, Lackawanna and Western Railroad Company.

*Eminent domain—Damages—Evidence—Culm.*

In a statutory proceeding against a railroad company to recover damages for culm taken by the company under the right of eminent domain for ballast, filling, excavations and embankments, evidence is admissible that, at the time it was taken, culm was used generally for the purpose of grading streets and railroads, and for other like purposes, and that the owners of culm piles gave the material away, and were glad to get rid of it without expense to themselves.

*Eminent domain—Damages—Proof of actual loss—Evidence.*

On the trial of an appeal from the report of a jury of view appointed to assess damages for property taken under the right of eminent domain, it is proper for the court to charge that the plaintiff is not entitled to a verdict without proof of actual loss.

Argued Feb. 22, 1899. Appeal, No. 347, Jan. T., 1898, by plaintiff, from judgment of C. P. Lackawanna Co., June T.,

1892, No. 41, on verdict for defendant. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Affirmed.

Appeal from report of jury of view. Before ALBRIGHT, P. J., of the 31st judicial district, specially presiding.

At the trial it appeared that in 1886 the defendant entered upon the land of the plaintiff and removed a large quantity of culm for the purpose of using it for ballast, filling, excavations and embankments.

N. S. Stetler, called by defendant, testified as follows:

" Q. Is not it a fact that the material in dumps in those years was used for filling up ground, and grading streets and other purposes of that character, it being furnished free of cost by the owners thereof?"

Plaintiff objects to the question as irrelevant and immaterial.

The Court: The latter part is objectionable, but the first part of the question is admitted and may be answered, that is, whether it was generally used for filling material.

The objection overruled. Exception noted for plaintiff at whose request a bill is sealed. [1]

" Q. What is the fact as to that, whether it was used as filling material? A. Yes, it has been, a great deal of it."

Samuel Hines, called by defendant, testified as follows:

" Q. Is it not a fact that culm dumps were used during those years in filling and grading, ballast of tracks and railroads, filling streets and excavations?"

Plaintiff objects to the question as immaterial and irrelevant.

The Court: The objection is overruled. It may have some bearing upon the value of the dump in question at the time. Bill sealed for plaintiff.

" A. Yes, sir." [2]

A. B. Stevens, called by defendant, testified as follows:

" Q. Do you know whether or not it is a fact that in the year 1882 and down to as late as 1886, a dump of the character of the one in question here, and the materials in it, were used for filling and grading and general land purposes, and not as fuel?"

Plaintiff objects to the question as immaterial and irrelevant.

Mr. Warren, of counsel for defendant: I will add to the question whether " without cost, proprietors here in those years

did not permit it to be taken away (without cost to the proprietors) and whether they were not glad to get rid of it?"

Plaintiff objects to the question as establishing a custom which does not affect the value in any way.

The Court: Objection is overruled. Bill sealed for plaintiff.

" Q. What do you say? A. I say that is a fact." [3]

Samuel Hines further testified on the part of the defendant, as follows:

" Q. Do you remember whether pea coal was being prepared for market during those years by your company?"

Mr. Torrey, of counsel for plaintiff: " Q. Where was the culm dump during those years, on the east or on the west side of the railroad? A. I am not certain. At the beginning of the time I think perhaps a small quantity may have been dumped on the west side, but the most of it was dumped opposite the railroad, across the railroad. Q. That is on the east side? A. Yes, sir."

Plaintiff now objects to the question of defendant's counsel.

The Court: But is there evidence in the case by which it could be inferred that the character of the coal differed much when they dumped on the one side or the other?

Mr. Torrey: This is an inference, your honor, which cannot be drawn.

The Court: Without any distinct evidence that the character of the refuse changed when they began to dump on the east side, we think that this witness might testify his knowledge as to the character of the refuse generally; it may have some bearing upon that which was in the bank on the west side.

Objection overruled; exception for plaintiff and bill is sealed.

### REDIRECT EXAMINATION.

Mr. Warren: " Q. Now the question I asked you was whether you remember whether there were screens in the breaker for the preparations of pea coal during those years? A. We shipped no pea during my time. Q. Were there screens for its separation and preparation there? A. I think there were. Q. What kind of coal was the steam generated with that was used? A. With pea coal. Q. Now do you remember the character of the veins that were mined by the company, as to thickness, as to quality, and the character of the coal; if so, tell us what

your recollection is as to that. A. The coal that we got from what I presume you call the plaintiff's tract there, what we call the Carbon Hill tract, was very thin; the vein was very thin, and mixed very largely with rock and slate; it was dirty, it was very costly to mine. Q. Now coming down to 1882 and those four years following, 1882 to 1886, and including the year 1886, what were you personally engaged in then? A. I was engaged in the work of the Hillside Coal and Iron Company in those years. Q. In what official position if any? A. First as superintendent, and afterwards as president. Q. It was mining in this region, was it not, during these years, from 1882 to 1886? I don't mean in the Mudtown breaker, but in this section of Pennsylvania? A. Yes, sir. Q. How many collieries did you have during those years? A. Part of the time four, part of the time six. Q. Was the work of the company during those years under your personal supervision and control? A. General oversight, I should rather call it. Q. Did you have opportunities to ascertain the prices of coal in the market during those years and the demand for the several sizes? A. To some extent, yes. Q. This company mined quite a large tonnage, did it not, during these years? A. Well, we thought it was a large tonnage, but we don't consider it large today. Q. Well, it ran into the hundred thousands? A. Yes, sir, five or six hundred thousands a year. Q. And the mining was done through breakers with screens in the preparation that was then used? A. Yes, sir. Q. And the company had coal dumps in connection with their breakers? A. Yes, sir. Q. Now I want to ask you whether culm dumps were regarded as of any value during any of those years from 1882 to 1886? A. Some companies during those years separated their depletus; they threw it away; the culm and whatever size might be in it below chestnut; then again other collieries separated the slate and rock from the other. Now these culm dumps which contained no rock were considered valuable. Q. I mean where the dumps were thrown in promiscuously with the sulphur and bone and rock and slate and some pea and buckwheat and smaller stuff, when it was all in one dump, were those dumps regarded as of any value during those years? A. Very few, if any. Q. Were there any endeavors around here with which you were familiar during those years where they attempted to utilize those dumps? A. Not that I

remember. Q. Isn't it a fact that culm dumps were used during those years in filling, grading, ballasting of tracks of railroads, filling the streets and excavations? A. Yes, sir.". [4]

The court charged in part as follows:

[If you find that it is proved that culm was taken by the defendant, then you will inquire whether the plaintiff had any damages. Ordinarily where one man unlawfully enters upon the land of another, there the complaining party is entitled to some damages, although he cannot show that what was done there was any special injury, or what was taken away was of any special value. The law says that for the invasion of a man's right he shall recover damages, even though none have been specially shown. In such cases the court direct the jury, if they find there was a trespass, to award nominal damages if nothing more; that is, six cents, or one dollar, or some other small sum. This, gentlemen, however, does not apply to this proceeding. The plaintiff by his proceeding has placed himself under the act of assembly which provides that the plaintiff shall have damages if any have been proved, and so I say to you that, although there has been a taking here of this culm, unless it is proved that the plaintiff had damages; that it was an injury to him, a deprivation to him of something that was of value to him, if you find there were no damages, then you will find in favor of the defendant, although the culm was taken.] [5]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1–4) rulings on evidence, quoting the bill of exceptions; (5) portion of charge as above, quoting it.

*James H. Torrey*, with him *John S. Harding* and *Charles H. Welles*, for appellant.—The evidence as to the use of the culm at the time it was taken was inadmissible: East Penna. R. Co. v. Hiester, 40 Pa. 53; Pittsburg & Western R. R. Co. v. Petterson, 107 Pa. 461; Pittsburg, etc., Ry. Co. v. Vance, 115 Pa. 331; Curtin v. Nittany Valley R. R. Co., 135 Pa. 20.

It was error to charge that the plaintiff must prove actual loss: Clark v. Penna. R. Co., 145 Pa. 438; Hogg v. Connellsville Water Co., 168 Pa. 460; Kenderdine Fuel Co. v. Plumb,

185 Pa. 463; Chicago West Division Ry. Co. v. Metropolitan Elevated R. R. Co., 152 Ill. 519; Chicago, Burlington, etc., R. R. Co. v. Chicago, 149 Ill. 457.

*Everett Warren*, with him *Edward N. Willard* and *Henry A. Knapp*, for appellee.—It being admitted that the plaintiff was entitled to compensation according to the just value of its property taken, the measure of such value was what the plaintiff could have realized for it in the market, less the cost of getting it there. This is exactly what this Court has decided in the very recent case of Lehigh Coal Co. v. R. R. Co., 187 Pa. 145, and is in line with the older cases of Coleman's App., 62 Pa. 279, Graham v. R. R. Co., 145 Pa. 504, Ege v. Kille, 84 Pa. 340, and McGowan v. Bailey, Wilson & Co., 179 Pa. 470.

The authorities cited by plaintiff are not in point. They are all cases involving the taking of land, not personalty, and the method of ascertaining plaintiff's damages, if any, in that line of cases, is not applicable to the case in hand.

This was a statutory proceeding. The forum was changed by plaintiff's appeal from the award of viewers, the cause of action remained the same: Bank v. Shoenberger, 111 Pa. 95; Jones v. Erie, etc., R. R. Co., 144 Pa. 629; Wilson v. City of Scranton, 141 Pa. 621; Deihm v. Snell, 119 Pa. 216.

The situation of this culm pile and its character and condition made its removal an actual benefit to plaintiff. It is true the company used a part of the dump for its switches for some time; the plaintiff never complained of this use; the land in that locality, like the dump, was worthless. Upon this point, it is submitted, actual damages are the subject of inquiry in cases of this character: The Barclay R. R. and Coal Co. v. Ingham, 36 Pa. 194; R. R. Co. v. Bunnell, 81 Pa. 414; Guess v. Stone Mountain Granite, etc., Co., 28 Am. & Eng. R. R. Cases, 236.

OPINION BY MR. JUSTICE FELL, March 27, 1899:

The assignments of error present two questions. One relates to the admission of testimony offered by the defendant to show that the materials taken by it from the plaintiff's land had no market value, and the other to the instruction by the court that there could be no recovery by the plaintiff without proof of actual loss.

The plaintiff is the owner of coal lands on which from 1868 to 1876 mining operations were conducted by its lessees. Quantities of culm from the breakers were deposited at the side of the bluff near the defendant's road. In 1886, according to the plaintiff's contention, and in 1882 and 1883, according to the defendant's, a considerable quantity of the culm was removed by the defendant and used by it for ballast, filling, excavations and in constructing embankments. Under the provisions of special acts incorporating the Pennsylvania Coal Company and the Lackawanna and Bloomsburg Railroad Company, which were merged with the corporation defendant, the plaintiff in 1892 filed a petition in the common pleas for the appointment of a jury " to view the premises, estimate and determine the quantity, quality and value of the materials so taken as aforesaid, and to estimate and determine, as provided by law, whether, and, if any, what, damages have been or may be sustained," etc. The plaintiff appealed from the finding of the jury, and on the trial in the common pleas of the issue thus arising the defendant claimed that the culm at the time it was taken had no market value. In support of this claim it offered testimony to prove that in the same general locality from 1882 to 1886 culm was used generally for the purpose of grading streets and railroads, and for other like purposes, and that the owners of culm piles gave the material away, and were glad to get rid of it without expense to themselves.

The rulings of the learned judge on the admission of this testimony were in entire harmony with the well established rule for determining the measure of damages where property is taken under the right of eminent domain. No land was taken, and there was no injury to the land by reason of the removal of the piles of refuse. The only thing taken that had a possible value was the coal in the culm piles, and the plaintiff's case rested on proofs of the amount and value of the coal. The inquiry was then narrowed to the market value of the culm piles at the time they were taken. That culm was used for the same purposes as stone, sand and clay, and was given away by the owners with a desire to get rid of it, was illustrative and confirmatory of the assertion that it had no market value. A single instance, it is true, would not be enough, as a particular sale of land is not evidence of the market value of other land in the same

vicinity, as it may have been compelled by necessity or have been the result of caprice or folly: P. & W. R. R. Co. v. Patterson, 107 Pa. 461. Culm piles at that time were not sold; they were not retained by the owners with a view to a prospective value. Evidence that they were generally used for the commonest purposes, for which other materials could have been had without cost, and that they were freely given away, went directly to their market value.

In an action of trespass for taking its property the plaintiff would have been entitled to recover nominal damages without proof of actual loss. But this was a statutory proceeding to determine " whether, and, if any, what damages, had been sustained." The entry was under the right of eminent domain. The culm was taken with the full knowledge and passive assent, if not with the actual permission of the plaintiff, who acquiesced without objection in all that was done by the defendant. The whole proceeding was to recover damages based, not upon a wrongful invasion of the plaintiff's rights, but upon an act of assembly which authorized the taking of the property, and made the defendant liable for the damage actually done. We therefore see no error in the instruction that the plaintiff was not entitled to a verdict without proof of actual loss.

The judgment is affirmed.