**In the Matter of READING COMPANY, Debtor.**

**Bankruptcy No. 71–828.**

United States District Court, E.D. Pennsylvania.

July 30, 1987.

See also, D.C., 72 B.R. 293.

Howard H. Lewis, Philadelphia, Pa., for plaintiff.

James D. Watt, Jr., James J. Curran, Pottsville, Pa., for defendant.

MEMORANDUM AND ORDER

DITTER, District Judge.

This case comes before me on the petition of the Reading Company to enjoin Reading Anthracite Company ("Anthracite") from interfering with coal fill ("culm") removal in St. Clair, Schuylkill County. Previously, a temporary restraining order was issued that allowed Reading to remove and sell the culm and to deposit the proceeds in an escrow account. Several evidentiary hearings were held, and based upon them, I make the findings of fact and reach the conclusions of law set forth in this memorandum. For the reasons that follow, I will grant Reading's petition.

Prior to its bankruptcy and subsequent reorganization, Reading operated a railroad that ran through the town of St. Clair and for five miles over land owed by Anthracite. Culm, coal dust and pieces once considered too small for commercial use, was part of the ballast making up Reading's roadbed. Effective February 27, 1976, Reading discontinued service on this line. Thereafter, it removed the tracks and other materials on its right of way. Reading then sought to remove the culm, leading to the present dispute as to its ownership with Anthracite.

While the parties were unable to agree formally upon a stipulation of facts, certain facts are not in dispute. On February 7, 1828, the Mill Creek and Mine Hill Navigation and Railroad Company, predecessor of Reading, was incorporated by special act of the General Assembly of Pennsylvania ("Act of 1828"). Pursuant to the act, the Mill Creek Company was authorized to build a railroad from the mouth of Mill Creek to the foot of Broad Mountain, choosing the most convenient route. The company was required to compensate the owners of the land for damages sustained by the taking of the right of way, "taking into consideration the advantages derived to the owner or owners of the premises ..." Act of 1828, § 9. The company was also vested with the authority to enter adjoining lands to remove any "stone, sand, gravel, or earth" necessary for construction of the railroad with the provision that the company pay for the materials. *Id.* at § 10.

The railroad was constructed sometime between 1830 and 1860. In 1828, the Hickory Colliery, predecessor to Anthracite, began mining operations at the Hickory Slope. The colliery and slope are located five hundred to six hundred feet from the closest point of the railroad. From 1828 to 1873, two million tons of marketable coal were processed at the colliery. An unknown amount of culm was processed at the Hickory Colliery prior to 1873; generally, however, the amount of culm equaled the amount of then marketable coal.

In 1861, Reading leased the railroad and other properties of Mill Creek.[1] In 1871, Philadelphia and Reading Coal and Iron Company ("P & R") took title to a number of coal properties including the Hickory Colliery. P & R was a wholly-owned subsidiary of P & R Railroad which also owned the Mill Creek Company. In 1923, pursuant to an antitrust decree in *United States v. Reading Company*, No. 1095 (E.D.Pa. 1913), P & R Railroad was merged into Reading which then sold all of its interest in coal properties to Anthracite's immediate predecessor. The decree provided for general releases of "all claims and liabilities as between the Reading Company and the Coal Company ..."

Reading advances several points in support of its petition.[2] Its primary argument

---

1. In 1949, Mill Creek was merged into Reading.

2. Reading claims ownership of the culm by adverse possession or abandonment. In the alter-

centers on the contention that Mill Creek deposited the culm into the roadbed during construction of the railroad. Reading argues that culm used as ballast is personal property which is owned by Reading because it is presumed to have paid for the culm under the Act of 1828. If the presumption is rebutted, Reading argues that the original owner is only entitled to the market value of the culm at the time of condemnation. Anthracite maintains that the railroad was built on a pre-existing culm bank; therefore, it claims ownership as the owner of the fee simple. It also argues that culm used as ballast in a railroad right of way is realty belonging to the owner of the land.

■ Under Pennsylvania law, a railroad that acquires a right of way by eminent domain acquires an interest characterized as either an easement or a conditional (base) fee. *Compare Fleck v. Universal Cyclops Steel Corp.*, 397 Pa. 648, 156 A.2d 832 (1959) (easement) *with Brookbank v. Benedum-Trees Oil Co.*, 389 Pa. 151, 131 A.2d 103 (1957) (conditional fee). Under either characterization, a railroad's interest in the right of way is extinguished after cessation of rail operations.

■ Here, there is no deed or conveyance that granted Mill Creek a fee simple; therefore, the nature of Reading's successor interest is governed by the Act of 1828 which authorized Mill Creek "to enter upon any lands ... which shall appear to them most convenient and best adapted for the route of said canal or railroad, and to cut, break, and remove, and take away all trees, rocks, stones, earth, ... or any obstruction...." As noted by the court in *Brookbank*, these rights are rights normally associated with a fee simple interest and

would be superfluous if the railroad owned the right of way in fee simple. Moreover, Mill Creek was required to compensate landowners for damages sustained by the railroad "passing through his or her land." Clearly, the interest received by Mill Creek pursuant to the Act of 1828 is either a conditional fee or an easement in the right of way.[3]

■ A railroad's right of way extends from the top of cuts to the foot of hills or embankments that are necessary appurtenances to the tracks, *Palmer v. Philadelphia Suburban Transportation Co.*, 174 Pa.Super. 1, 98 A.2d 245 (1953). A railroad's rights by eminent domain are greater than a mere right of passage. For example, it may use sand, earth, or gravel necessarily excavated from the right of way in any manner except that it can not sell or give away these materials. *Hall v. Delaware, Lackawanna & Western Railroad Co.*, 270 Pa. 468, 113 A. 669 (1921). Thus, the threshold inquiry is whether the culm used as ballast was on the right of way prior to construction of the railroad. Based upon the overwhelming evidence of record, I conclude that the Mill Creek Company brought the culm from outside the right of way during construction.

At the time rail operations ceased, the culm line followed the railroad right of way and ranged from forty to eighty feet in width with no culm outside this line. The culm ranged in depth from eight to thirty feet and was basically pure culm, that is, it was not intermixed with other materials. In addition, the culm had been processed; it was not in its natural state. Ronald Ulmer, vice president of Anthracite, testified that the culm line was shaped to match the roadbed and that its width and depth

native, it argues that any claim Anthracite has in the culm was extinguished by the antitrust decree. Because of my disposition of Reading's primary claim, I need not reach these arguments.

3. Anthracite has not seriously contended that Mill Creek was not granted an interest in the right of way particularly since through the passage of time a railroad is presumed to have attained the right of way. *See Coxe v. Lehigh Valley Railroad Co.*, 20 Pa.D. & C.2d 111 (1958)

(presumption arises after twenty years), *aff'd*, 398 Pa. 424, 158 A.2d 782 (1960). Moreover, the lack of record of payment or a condemnation proceedings does not rebut this presumption since any damages to the landowner must take into account the benefit bestowed by the railroad on the owner's property. Due to the importance of rail transportation to coal mining operations, it is likely that no damages were incurred by the taking of the right of way by eminent domain.

changed with the topography to create a level surface.

A core of clay ran six to eight feet below the top of the culm line. Eugene Dinnocenti, Reading's consultant for removal operations, testified that the clay was used to stabilize the fill and was similar to the construction of several other rail lines he excavated. These facts demonstrate that the culm was placed in the roadbed at the time of construction. Anthracite nevertheless asserts that if the culm was not in place it was pushed up and molded from along the right of way. As previously noted, the right of way extends to the foot of the embankments. For the following reasons, it is inconceivable that the culm was along the right of way at the time of construction.

The colliery did not begin its operations until 1828 and the railroad was constructed sometime between 1830 and 1860. While two million tons of marketable coal were processed by 1873, there is no indication of the amount of coal produced before the railroad was constructed. More importantly, the colliery and slope were 500 to 600 feet from the closest point of the railroad. There is no possibility that during the first thirty years of operation, enough culm would have been produced so there was a culm bank extending for not only this 500 feet but also for the entire length of Mill Creek's five mile right of way.

In support of its position, Anthracite relies upon various maps and a photograph, all of which were produced during the early twentieth century. Anthracite argues that these exhibits demonstrate that the culm bank extended from the colliery to the right of way. These exhibits, however, are of little probative value in ascertaining the condition of the land between 1831 and 1863 since the culm bank necessarily grew each year that the colliery was in operation. In addition, these exhibits do not show the existence of a culm bank along the entire length of the railroad line. Therefore, I conclude that the culm used as

ballast in the roadbed was transported from outside the right of way.

■ Anthracite contends that if the culm was brought to the right of way by Mill Creek, it became part of the realty. In Pennsylvania, culm becomes personal property once it is severed from the land. *Universal Minerals v. Hughes,* 669 F.2d 98 (3d Cir.1981); *Williams v. Bridy,* 391 Pa. 1, 136 A.2d 832 (1957). Due to the nature of the railroad's interest attained by eminent domain, any personal property brought onto the right of way retains its nature as personalty, even if it becomes affixed to the realty. Thus, a railroad can remove any tracks, ties, or other materials, including ballast that it has placed on its right of way. *Wiggins Ferry Co. v. Ohio & Mississippi Railway Co.,* 142 U.S. 396, 12 S.Ct. 188, 35 L.Ed. 1055 (1892); *Lawson v. Simonsen,* 490 Pa. 509, 417 A.2d 155 (1980) (tracks, ties, ballast and other materials placed upon right of way by railroad retain nature as personalty).[4] *See also State of Delaware v. Penn Central Corp.,* 445 A.2d 939 (Del.Super.1982) (plaintiff conceded railroad's entitlement to compensation for "rails, ties, ballasts and bridges"); *Martell v. Stewart,* 6 Kan.App.2d 387, 628 P.2d 1069 (1981) (railroad can remove ballast provided that it has not abandoned the ballast). Thus, since the culm retains its nature as personal property Reading can remove the culm if it has an ownership interest.

■ The Act of 1828 expressly authorized Mill Creek to enter surrounding lands and to remove "stone, sand, gravel, or earth" and to pay for these materials. Anthracite contends that because culm was not a listed material, Mill Creek acted as a trespasser in removing culm and thus, it has not paid for nor is it entitled to the culm. I find, however, that use of culm falls within the meaning of the Act and that Reading is presumed to have paid for the culm. Even if the presumption does

---

**4.** Anthracite relies upon *Short v. Howard,* 19 Lack.Juris. 40 (1917); however, to the extent *Short* conflicts with *Lawson* it has been reversed. Moreover, unlike the present case, the

railroad in *Short* had abandoned the railroad bed for seventeen years and the court found that the railroad acted as a trespasser in placing the culm in the roadbed.

not apply, the culm had no condemnation value.

The parties agree that culm was considered worthless until 1877. Prior to that time, there was no known commercial use for coal dust and the small pieces of coal that comprised culm. For this reason and because of its physical similarity to sand, gravel, or earth, it is reasonable to conclude culm was considered a substitute material. It was readily available in large quantities and served no purpose other than being used for ballast. This conclusion is supported by the turn-of-the-century Pennsylvania Supreme Court decision, *Morris & Essex Mutual Coal Co. v. Delaware, Lackawanna & Western Railroad Co.,* 190 Pa. 448, 42 A. 883 (1899). Between 1882 and 1886, defendant removed culm belonging to plaintiff for ballast and construction of embankments under right of eminent domain.[5] A jury found that at the time of removal the culm had no market value. In upholding the verdict, the court stated, "culm was used for the same purposes as stone, sand, and clay, and was given away by the owners with a desire to get rid of it ... Culm piles at that time were not sold, they were not retained by the owners with a view to a prospective value." 190 Pa. at 454–55, 42 A.2d at 884.

■ Assuming that the culm was processed at the Hickory Colliery and was not gladly given away, the law creates a rebuttable presumption of payment after twenty years where payment was required and a procedure for payment was established. *Brankin v. Philadelphia, Newtown & New York Railroad Co.,* 286 Pa. 331, 133 A. 563 (1926); *Coxe v. Lehigh Valley Railroad Co.,* 20 Pa.D. & C.2d at 115. Here, more than twenty years has run not only from Mill Creek's acquisition of the culm but

also from the entry of the antitrust decree that severed the interests between the railroad and coal companies. To overcome the presumption, Anthracite relies upon the testimony of Ronald Ulmer that there is no record of a condemnation proceeding nor of a claim for damages. His testimony, however, was directed towards condemnation of the fee underlying the right of way, not the condemnation of the culm and, it does not rebut the presumption.[6]

■ Moreover, even without the presumption of payment, Anthracite is not entitled to any of the proceeds. Damages for a taking of property under eminent domain are measured by the value of the property at the time of the condemnation. *Nittany Valley Railroad Co. v. Empire Steel & Iron Co.,* 218 Pa. 224, 67 A. 349 (1907); *Morris & Essex, supra.* The parties agree that the culm was worthless prior to 1876; therefore, Anthracite is not entitled to any compensation if the taking was under eminent domain.

Because I conclude that Reading owns the culm under right of eminent domain, I will grant its petition to enjoin Anthracite from interfering with the removal of the culm.[7]

---

5. Defendant's actions were pursuant to special acts incorporating the Pennsylvania Coal Company and the Lackawanna & Bloomsburg Railroad Company.

6. Anthracite also asserts the twenty year period did not run until 1977 when Reading removed the culm. This argument is without merit in light of my previous conclusion that the culm was transported to the right of way.

7. During the pendency of Reading's petition, several motions were filed. For purposes of clarification, I note that respondent withdrew its motions for submission of maps, challenging my jurisdiction, and for remand to state courts. At the time of an evidentiary hearing in this matter, I ruled upon the admissibility of the documentary evidence and I denied Anthracite's motion for summary judgment.