# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JOAN NARVESEN and EDWIN NARVESEN, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 2022-0531-LM ) |
| JOHN ANTHONY PALMER and JENNIFER M. BARKER, as individuals, who are married to one another, | ) ) ) ) ) |
| Defendants. | ) ) |

## FINAL POST-TRIAL REPORT

Date Submitted: May 19, 2025[1]
Date Decided: August 14, 2025

Donald L. Gouge, Jr., DONALD L. GOUGE, JR., LLC, Wilmington, Delaware; *Attorneys for Plaintiffs Joan Narvesen and Edwin Narvesen*.

William J. Rhodunda, Jr., RHODUNDA, WILLIAMS, AND KONDRASCHOW, Wilmington, Delaware; *Attorneys for Defendants John Anthony Palmer and Jennifer M. Barker*.

**MITCHELL, Magistrate**

---

[1] Although the trial concluded on April 2, 2025, the parties provided supplemental documentation to the Court regarding trial exhibits on May 9, 2025 and May 19, 2025.

This case deals with a dispute between neighboring property owners. The parties' disagreement centers on an easement, which serves as a shared paved entryway that runs between their properties. The parties are no strangers to conflict. Herein I am likely unable to provide a complete resolution to the decade long feud between the neighbors; however, I do hope this report provides an equitable resolution that will allow the parties to each move on with their lives and does not taint the rights and relationships of future owners of these properties.

## I.    BACKGROUND[2]

Egil and Genevieve Narvesen purchased the property located at 1102 Virginia Avenue, Newark, Delaware (hereinafter, Plaintiffs' Property) in 1964.[3] Egil Narvesen passed away in 1983 and Genevieve Narvesen passed away in 2021.[4] Their

---

[2] The facts in this report reflect my findings based on the record developed at the two-day trial that took place on April 1, 2025 and April 2, 2025. *See* Docket Item ("D.I.") 56. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form of "Tr. #." *See* D.I. 59 and 60. The parties individually submitted exhibits. Plaintiffs' exhibits are cited as "PX__." Defendants' exhibits are cited as "DX__." On May 9, 2025, the parties submitted a letter to the Court after trial that indicated the exhibits they wished for the Court to consider. D.I. 61. The letter identifies from Plaintiffs' exhibits ("PX"): 1, 2, 8-11, 18, 19, 21, 23-25, 27, 31-34; and from Defendants' exhibits ("DX"): A-G, I-K, M, O, P, R, T-Z, BB (only the photographs), FF, HH, KK, and LL. Of these exhibits submitted for the Court's consideration, three are depositions. *See* PX 18; DX HH; DX KK. The parties deposed, John Palmer, Edwin Narvesen, and a representative from the Delaware Department of Transportation (hereinafter, "DelDOT"), Brian Urbanek, and will be cited herein as "(PX or DX) _ (Last Name) Tr. #."

[3] Tr. 29:21–30:5; DX C. Plaintiffs' property is identified in surveys as parcel number 29. Tr. 142:8–11; *see, e.g.* DX I.

[4] Tr. 32:6–17.

children, Joan Narvesen and Edwin Narvesen, plaintiffs to this action, inherited the property after their mothers passing and they both continue to reside in it.[5]

On February 28, 2001, Dr. Jennifer M. Barker purchased a property located at 23 Virginia Place, Newark, Delaware (hereinafter, Defendants' Property).[6] Dr. Barker and John Anthony Palmer, making up the two defendants to this action, were married on February 28, 2005.[7] Dr. Barker transferred Defendants' Property by quitclaim deed on February 22, 2008, to herself and her husband, Mr. Palmer, taking ownership as tenants by the entirety.[8]

### A.    The Parties Properties and Virginia Place

Plaintiffs' Property and Defendants' Property are located in a neighborhood called Tip Top Farms in Newark, Delaware.[9] Virginia Avenue ends in a cul-de-sac with two paved roadways leading off to the left and the right identified on multiple different diagrams labeled "Virginia Place."[10] The left portion of Virginia Place is the parcel at issue that lies between Plaintiffs' Property and Defendants' Property and provides both parties with their only means of ingress and egress onto their

---

[5] Tr. 32:18–21; Tr. 29:21–30:1; Tr. 100:23–101:2.

[6] PX 8 at 0125; Tr. 137:14–21. Defendants' property is identified in surveys as parcel number 30. Tr. 142:3–7; *see, e.g.* DX I.

[7] PX 8 at 0131; Tr. 230:2–3.

[8] PX 8 at 0131; Tr. 229:19–230:1.

[9] DX A at 006; Tr. 138:20–22; *see also* DX F at 028.

[10] *See, e.g.* DX F at 028; DX I; PX 32.

respective properties.[11] At the time Dr. Barker purchased her property it was her understanding that she had a right of access for ingress and egress on a private road known as Virginia Place.[12]

In the original plans for Tip Top Farms, Virginia Place was part of the roads dedicated to the community for universal access throughout the neighborhood.[13] In 1964, the former owners of Plaintiffs' Property, Genevieve Narvesen and her husband, were transferred 10 feet of the right of way from the developer, after receiving approval of the conveyance from the owners of the two other affected lots which included the developer and the former owners of Defendants' Property.[14]

On May 11, 1998, the developer executed a document, containing only his signature, that purported to "convey, transfer and deliver unto the public and to any State, County, or other local government authority having jurisdiction over the subject matter hereof, all certain streets, roads and ways known as Virginia Avenue and Virginia Place…."[15] A representative from DelDOT that was deposed for this trial indicated that this was a dedication to the public and he had no knowledge that

---

[11] *See* DX I. For the sake of clarity, I will refer to this parcel at issue as "Virginia Place," acknowledging that the road across the cul-de-sac is also "Virginia Place," however hereon this identifier will only be used to refer to the parcel in dispute.

[12] Tr. 138:8–139:2.

[13] DX A.

[14] DX D; Tr. 142:15–143:6; *see also* DX F at 028.

[15] DX E at 022.

the State accepted any transfer nor that the State now considered Virginia Place to be a state maintained road.[16] The representative indicated a distinction in DelDOT's records between state maintained roads and roads that have been dedicated to the public such that they qualify for certain legislative funding for maintenance.[17] Despite the purported dedication to the State, on June 4, 2001, the developer transferred by quitclaim deed the remaining land known as Virginia Place to Genevieve Narvesen, "[s]ubject to the restrictions, reservations, easements, conditions and limitations of record."[18]

**B.** **The 2009 Matter and the Intervening Events Leading up to the Death of Genevieve Narvesen.**

In 2008, a lawsuit was filed in the Court of Chancery by the Defendants against Genevieve Narveson regarding the maintenance of Virginia Place in which the parties reached a settlement, approved by the Court, dated June 11, 2009 (hereinafter, "2009 Settlement").[19] The agreement includes the Defendants' express right of access over Virginia Place to their own property, parameters to how the Plaintiffs and Defendants are to maintain the right of way and the foliage

---

[16] DX KK (Urbanek) Tr. 17:13–21 (Q. "…so what is the status of Virginia Place or Virginia Avenue, are they privately owned?" A. "Based on the information I saw from the FOIA request it looked like the road has been dedicated to public use but not state maintained").

[17] DX KK (Urbanek) Tr. 21:12–22:13.

[18] DX G at 030.

[19] D.I. 53 at 5; DX J.

surrounding it, and parameters of the Defendants' right of access onto Virginia Place and rights to perform maintenance tasks.[20] The Defendants agreed not to contest the Plaintiffs' fee ownership of Virginia Place.[21] The 2009 Settlement, specifies that it runs with the land and is enforceable on the parties heirs, successors, purchasers and assigns, and directed the parties to stop filming and photographing one another.[22]

In connection with the 2009 Settlement agreement, another agreement was entered between the Defendants and Geneveive Narvesen.[23] Therein, John Palmer agreed not to enter the Plaintiffs' property and Genevieve agreed to ensure her son, Edwin Narvesen, would not enter the portion of Defendants' property described in paragraph 9 of the 2009 Settlement.[24] The agreement also provides that its contents are to "remain confidential and shall not be made public or disclosed to any person," except for the parties to the agreement, Edwin Narvesen and Joan Narvesen.[25] Notably, Edwin Narvesen was not a party to this agreement.[26]

---

[20] DX J.

[21] *Id.* at ¶8.

[22] *Id.* at ¶11.

[23] DX K.

[24] *Id.* at ¶2-3; DX J at ¶9.

[25] DX K at ¶4.

[26] DX K.

## C. The Present Matter

After the death of Geneveive Narvesen in 2021, when her property transferred to her children, the neighbors in this action had ongoing conflict as to their responsibilities as they relate to the right of way and the 2009 Settlement. The current disputes remain largely the same as they were leading into the original 2008 action, ranging from the subjects of maintenance to filming one another to various verbal arguments.[27]

The state of Delaware and DelDOT were involved in the installation of a drain for the purposes of water management and on two occasions, in the years 1998 and 2013, paved the road that sits on Virginia Place.[28] The Defendants put in a request with the State because of water runoff from Virginia Place onto the Defendants' Property.[29] The Defendants also allege that the Plaintiffs exacerbated the water problem by dumping water out of their driveway and by directing their drain spout towards the Defendants' property.[30] The Plaintiffs claim that the construction of the drain constitutes trespass and breach of the 2009 Settlement which provides limited in scope maintenance access rights that primarily provide rights to pave the existing driveway as necessary and manage the foliage and any debris that may fall into the

---

[27] *See* D.I. 1; D.I. 6.

[28] Tr. 156:20–157:5; *see* DX O.

[29] Tr. 157:13–23.

[30] Tr. 160:21–161:7.

6

right of way.[31] The Defendants and DelDOT provided the Plaintiffs with notice of the construction of the drain.[32]

The parties remain in dispute over maintenance responsibilities. Defendants claim that Plaintiffs have failed to fulfill their obligation of maintaining clear access over the driveway and trimming the vegetation up to a height of 15 feet within the driveway.[33] Both parties complain that the others are not fulfilling their maintenance obligations and that the others are responsible for blowing debris onto their respective properties.[34] The parties had a dispute in March 2023 that involved trees in danger of falling onto the Defendants' home that was eventually resolved when the Plaintiffs' paid for the removal of the tree.[35] Plaintiffs claim that the Defendants are in violation of the settlement order for entering onto Plaintiffs' property and trimming vegetation and for the installation of the drain.[36]

Both parties complain, accurately, that the others have been filming and photographing them evidenced by each parties' provided photographs for trial in and of themselves and through their contents that reflect the presence of multiple

---

[31] D.I. 53 at 8; DX J at ¶3–5.

[32] Tr. 157:6–158:3.

[33] D.I. 6 at 36; DX J at ¶2-3.

[34] D.I. 1 at ¶27; D.I. 6 at 36; DX R; DX W; PX 31.

[35] Tr. 217:9-22.

[36] D.I. 1 at 82.

cameras directed at the other party.[37] The Defendants express aesthetic concern over the Plaintiffs' use of Virginia Place specifically complaining of the Plaintiffs' spare trashcans they have lining the road, the garden faces they have affixed to trees, and various signs they have put up.[38]

The parties are also concerned about their own privacy and safety from the other. There had been many instances when the parties called the police on one another.[39] The Plaintiffs hung tarps above the green privacy fence separating the properties and both parties are complaining of the others videoing and photographing them.[40] The Defendants presented at trial a picture of Mr. Narvesen in a tree peering over the privacy fence, pictures of cameras on the Plaintiffs' Property directed at the Defendants' Property, and a video of Mr. Narvesen at night standing directly in front of the driveway entrance of Defendants property.[41] There was an additional instance in which Mr. Narvesen used his own car to block an internet service van from leaving the Defendants' driveway, prompting the Defendants to have to call the police to have him move.[42]

---

[37] Tr. 114:19–115:1; Tr. 182:20–184:13; DX R; DX T; DX W; DX X; DX Z; PX 31.

[38] Tr. 181:3-12; Tr. 171:13–18; DX W.

[39] Tr. 123:8–15; Tr. 127:16–22; Tr. 171:20–24; Tr. 282:18–24.

[40] DX R; DX W; Tr. 186:10–20.

[41] DX U; DX W; Tr. 95:18–96:7; Tr. 189:3–6.

[42] Tr. 151:9–13; Tr. 270:4–271:24; DX V.

8

There were other incidents in which Mr. Narvesen drove recklessly in, what the Defendants' reported, was directed against them in a violent manor.[43] One of the incidents occurred soon after the Parties had settled in 2009, when the Defendants were erecting the fence on their property as directed in the 2009 Settlement.[44] While the Defendants were outside erecting the fence, they were approached by Mr. Narvesen and Genevieve Narvesen, and Mr. Palmer asked Genevieve Narvesen whether she was satisfied with the location of the fence.[45] Mr. Narvesen became angry and started yelling expletives at Mr. Palmer and giving both the Defendants the middle finger.[46] Genevieve Narvesen tried to get Mr. Narvesen to calm down, but he walked away, got in a car, and came speeding out of his driveway nearly hitting his own mother and speeding down the road causing the Defendants to both jump out of the way to avoid being hit by the vehicle.[47]

---

[43] Tr. 175:17–176:13; Tr. 252:10–253:12.

[44] Tr. 251:16–252:7.

[45] Tr. 252:10–22.

[46] *Id.*

[47] Tr. 252:23–253:12.

## D. Procedural Posture

On June 21, 2022, Plaintiffs filed the initial complaint requesting relief in the form of declaratory judgment, injunction, and equitable rescission for Defendant's conduct they allege to have amounted to trespass, invasion of privacy, intentional infliction of emotional distress, and breach of settlement agreement.[48] Defendants filed their answer and affirmative defenses along with their counterclaims on August 1, 2022.[49] The Defendants assert in their counterclaims that the Plaintiffs' breached the 2009 Settlement and further allege that the Plaintiffs' extreme and outrageous conduct makes them liable to Defendants for intentional infliction of emotional distress.[50] On August 17, 2022, the Plaintiffs filed their answer and affirmatives defenses to Defendants' counterclaims.[51]

On February 2, 2024, the Defendants filed motions for expedited proceedings and mandatory injunctive relief in reference to a tree on Plaintiffs' property that was in danger of falling on the Defendants' home.[52] Plaintiffs filed their responses to each of these corresponding motions, however on February 16, 2024, the Defendants' informed the Court that the parties agreed to withdraw their motions

---

[48] D.I. 1.

[49] D.I. 6.

[50] D.I. 6 at 35–37.

[51] D.I. 7.

[52] D.I. 13; D.I. 14.

because the tree that was the subject of the motions had since been removed by the Plaintiffs.[53]

On January 3, 2025, the Defendants' moved for summary judgment.[54] The Plaintiff's responded to Defendants' motion for summary judgment on January 31, 2025.[55] The deadline for answering briefs for dispositive motions were due on January 31, 2025.[56] On February 28, 2025Defendants filed a letter on the docket containing additional evidence they asked the Court to consider in their decision on their motion for summary judgment.[57] The Court issued a letter denying Defendants' motion for summary judgment on March 18, 2025, and therein declined to consider the additional information submitted by the Defendants because it was submitted after the stipulated deadline.[58]

A pretrial conference was held on March 27, 2025.[59] A two-day trial was held, as scheduled, on April 1, 2025 and April 2, 2025.[60] Thereafter, I took this matter under advisement.

---

[53] D.I. 16; D.I. 17; D.I. 20.

[54] D.I. 33.

[55] D.I. 37.

[56] D.I. 22 at ¶4.

[57] D.I. 42.

[58] D.I. 49 at 7; D.I. 22 at ¶4.

[59] D.I. 54.

[60] D.I. 56; D.I. 22 at ¶8.

## II. ANALYSIS

I begin this analysis with the issue of ownership to Virginia Place and the validity of the easement granted to the owners of the Defendants' property. I discuss the parties' respective claims of intrusion upon seclusion, intentional infliction of emotional distress, and trespass. Then, finally, I address the issues related to the 2009 Settlement Agreement and the path towards a workable agreement that governs the relationship between the owners of these two parcels and the use of Virginia Place moving forward.[61]

For reasons I will further explain below, I find that Virginia Place is owned by Plaintiffs and is not owned by the state of Delaware, and I do not find that either side has met their burden to prove their claims for intrusion upon seclusion, intentional infliction of emotional distress, and trespass. Although I find it necessary to void the 2009 Settlement Agreement, I decline herein to rewrite the document, despite the parties' request for me to do so. I instead will give the parties an opportunity to submit proposed orders for my review governing the properties going

---

[61] The Defendants expressed concern at trial that Virginia Place no longer exists on publicly available maps, primarily citing to online map services, and requested that the Court enter some sort of order remedying this issue. Tr. 195:2–24; DX FF. I do not address this request in this report as it is outside the scope of the Court to remedy, nor was I presented with any evidence at trial that indicated it was caused by any action taken by the Plaintiffs. For similar reasons I do not address the Defendants'' concern regarding the environmental impact of the Narvesens' dumping their car wash water off their property. Tr. 161:16–162:3; DX P.

forward that bear in mind my findings herein and the further guidance I explain below.

### A. Virginia Place is owned by the Plaintiffs and the easement giving Defendants access onto Plaintiffs property is valid.

"[D]edication of a private way as a public street require[s] two elements: intent of the owner to dedicate and public acceptance of such intent, either through public user of the way or action by public authorities."[62] "[I]t is well known that while some kind of acceptance is necessary, it need not be acceptance by the general public. There can be acceptance by action of public authorities."[63]

There are distinctions between the dedication of a private street to public use that are "State Maintained" and that are "[n]ot State-Maintained."[64] Those streets that are qualified as being State Maintained are accepted into the state maintenance

---

[62] *Vetter v. Diamond State Tel. Co.*, 450 A.2d 877, 882 (Del. 1982); 17 Del. C. §131(e)(2)(a)-(c) (containing specific statutory requirements for the acceptance of private roads into state maintenance of being "dedicated to the public use, accepted by the State and the streets and roads constructed or reconstructed at the expense of the property owners in accordance with the standards established by the Department of Transportation," the roads' construction being approved by the Department of Transportation's maintenance engineer, and "copies of such certification have been forwarded to the members of the General Assembly in whose districts the roads to be accepted are situated.").

[63] *Id.* (quoting *Singewald v. Girden*, 127 A.2d 607, 616 (Del. Ch. 1956)); *Phillips v. Yinglin*, 1982 WL 149636, at *3 (Del. Ch. Apr. 23, 1982) (citing 17 Del. C. §131(a)) ("upon acceptance by the State of such private streets after being dedicated to public use, the State assumes their future cost of maintenance").

[64] 2 Del. Admin. Code 2309-8.7.1-2; *see also* 17 Del. C. §131(e) (describing the State's obligations and private subdivision's obligations to the maintenance of private streets and roads and the process by which private roads can be dedicated for public use).

system.[65] The state of Delaware, in order to accept the private road, requires the homeowners association or a majority of the property owners of a suburban community, as defined by the Delaware Administrative Code, submit a formal request "in accordance with State guidelines" to prompt a formal investigation and process that concludes with a formal approval from DelDOT's Public Works Engineer that confirms the road has been constructed to State standards and then formally accepts that road into the State Maintenance system.[66]

A street that is dedicated for public use but is not state maintained requires a less stringent process requiring the homeowners association or property owners dedicating the street "to public use by: re-recording the record plan, executing a Dedication Agreement, or other acceptable method of dedication."[67] Those streets that are not accepted into the state maintenance system but that have been dedicated for public use "are eligible for improvements funded by the Community Transportation program" while the road remains privately maintained by the homeowners association or the land owners.[68]

Here the Defendants argue that the 2001 quitclaim deed transferring the remaining portion of Virginia Place to Genevieve Narvesen did not convey anything

---

[65] *Id.* at 8.7.1.

[66] *Id.*

[67] *Id.* at 8.7.2.

[68] *Id.*

14

because Virginia Place had already been transferred to the public and the state of Delaware by the dedication entered in 1998.[69] However, Virginia Place was never formally accepted into state maintenance and was instead dedicated to public use without being accepted into state maintenance such that it can qualify for eligible improvements funded by the Community Transportation Program while remaining privately owned.[70] The representative from DelDOT, Brian Urbanek, testifies in his deposition that the State considers Virginia Place to be privately owned and that they consider the 1998 document is a "dedication to public use making it eligible for CTF funds."[71] The Defendants did not provide any evidence that the State took action to indicate any sort of formal acceptance of Virginia Place such that it would be publicly owned other than the maintenance provided, which is not alone a sufficient indication of whether or not Virginia Place is privately owned, nor have they made

---

[69] D.I. 33 at ¶8-16; DX E; DX F; *see also State ex rel. Dep't of Transp. v. Penn Cent. Corp.*, 445 A.2d 939, 946 (Del. Super. 1982) (citing 26 C.J.S. Deeds § 8, p. 592; *Greek Catholic Congregation v. Plummer,* 12 A.2d 435 (Pa. 1940)) ("A quitclaim deed is one which purports to convey nothing more than the interest or estate in the property described which the grantor possesses, if any, rather than the property itself").

[70] DX KK (Urbanek) Tr. 17:13–21 (Q. "…so what is the status of Virginia Place or Virginia Avenue, are they privately owned?" A. "Based on the information I saw from the FOIA request it looked like the roads has been dedicated to public use but not state maintained"); DX KK (Urbanek) Tr. 18:1–7 ("Basically when an owner dedicates it to public use it enables the road to then be eligible for community transportation funds if the legislator requests to provide funding").

[71] DX KK (Urbanek) Tr. 21:12–22:13.

any indication that the public has engaged in any conduct that would have effectuated acceptance of Virginia Place unto the public.[72]

The evidence supports the conclusion that the grant of Virginia Place in 1998 to the State was only a dedication of maintenance such that the privately owned road would be eligible for discretionary maintenance funding through the Community Transportation Program, and therefore the 2001 quitclaim deed successfully transferred unto the owners of the Defendants' parcel Virginia Place.

"An easement is a non-possessory interest in real property, granted for a particular purpose, enforceable of right and not depend[e]nt for its continued existence on the will of the grantor."[73] An express easement can be created through a writing that "contain[s] plain and direct language evidencing the grantor's intent to create a right in the nature of the easement," and "[n]o specific words are required so long as the writing clearly reflects the grantor's intent to create an easement."[74]

---

[72] *See* 2 Del. Admin. Code 2309-8.7.2 (aligning with Mr. Urbanek's testimony that indicated that private property can receive some maintenance from the State through community transportation funds); *see also Lofland v. Truitt*, 260 A.2d 909 (Del. Ch. 1969) (finding that the Plaintiff therein had failed to meet their burden of proof by a preponderance of the evidence that the public had accepted any public dedication when the use by the public was sporadic even though the Defendant welcomed members of the public to use the road but also finding that the Plaintiff had succeeded in establishing a limited right of access to the road through an easement established for the benefit of the Plaintiffs' parcels).

[73] *Coker v. Walker*, 2013 WL 1858098, at *3 (Del. Ch. May 3, 2013).

[74] *Buckeye P'rs, L.P. v. GT USA Wilmington, LLC*, 2022 WL 906521, at *29 (Del. Ch. Mar. 29, 2022) (quoting *Black v. Staffieri*, 2014 WL 814122, at *2 (Del. 2014)).

16

Evidence of an express grant of an easement "may be contained within the language of a deed or in a separate document."[75] The easement on Virginia Place is evidenced expressly in a survey done on March 14, 2008, in preparation for the original action and in the 2009 Settlement.[76] I find that the easement on Virginia Place is valid and enforceable by the Defendants to have a right of use for ingress and egress, as well as for some access for the purpose of maintenance.

**B.      The 2009 Settlement is independently sufficient to satisfy this Court's finding that the Plaintiffs are the owners of Virginia Place.**

I also find it pertinent to mention that, although I have provided legal analysis and judgment on the status of ownership of Virginia Place, the issue of ownership was resolved through a judicially approved settlement agreement in 2009.[77] The Defendants were the party that began the original action and entered into the 2009 Settlement, fully informed of the existence of the 1998 declaration they use today as the sole basis for their argument against the true owners of Virginia Place and the validity of the easement within.[78] The agreement expresses the existence of the easement, and the Defendants also agree not to contest the ownership of Virginia

---

[75] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *4 (Del. Ch. Nov. 5, 2004).

[76] *See* DX I; DX J at ¶4 ("In addition to right of access across the driveway, the [Defendants] have the right to enter the driveway for the purpose of maintenance…").

[77] DX J.

[78] *Id.*; Tr. 208: 22–209:1.

Place.[79] I therefore must find that Virginia Place is owned by the Plaintiffs and that the easement thereon is valid for the additional reason that this Court must give the same deference to judicially approved settlements as we would to any judgments based on a trial on the merits.[80]

### C. I do not find that either party's conduct amounted to that of such extreme and outrageous nature to support a claim for intentional infliction of emotional distress.

"The elements of the tort of [IIED] appear in Restatement (Second of Torts § 46 (1965) as follows: . . . [o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."[81] The conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[82] Proof of bodily harm accompanying the emotional distress caused by a defendant's actions is

---

[79] DX J at ¶1 ("[Defendants] have an easement for right of access to their property over the existing paved right of way"); DX J at ¶8 ("The [Defendants] agree not to contest [Genevieve Narvesen]'s fee ownership in Virginia Place").

[80] *Singer v. Creole Petroleum Corp.*, 297 A.2d 440, 442 (Del. Ch. 1972) (citing *Ezzes v. Ackerman*, 234 A.2d 444 (Del. 1967) (holding that a judicially approved settlement has the same res judicata effect of a judgment based on a trial on the merits).

[81] *Lee ex. rel. B.L. v. Picture People, Inc.*, 2012 WL 1415471, at *4 (Del. Super. Mar. 19, 2012) (quoting *Beckett v. Trice*, 1994 WL 710874, at *4 (Del. Super. Nov. 4. 1994)).

[82] *Id.*

not required where the defendant's actions are outrageous.[83] "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"[84]

Here, the Plaintiffs' claim that the Defendants are liable for intentional infliction of emotional distress for erecting a surveillance camera and recording Plaintiffs and for calling the police and threatening them with arrests.[85] The Defendants make similar allegations against the Plaintiffs alleging that they videotaped and photographed them, shouted at them, and called the police on them.[86] This conduct does not amount to such extreme and outrageous conduct such that it "goes beyond all possible bounds of decency," and therefore I do not find that either party is able to recover under intentional infliction of emotional distress for the aforementioned actions taken against one another.[87]

---

[83] *Adams v. Aidoo*, 2012 WL 1408878, at *9 (Del. Super. Mar. 29, 2012) (citing *Cummings v. Pinder*, 574 A.2d 843, 845 (Del. 1990)) ("A plaintiff need not show that the emotional distress he suffers as a result of a defendant's actions caused accompanying bodily harm where the defendant's actions are outrageous.").

[84] *Mattern v. Hudson*, 532 A.2d 85, 86 (Del. Super. 1987).

[85] D.I. 1 at ¶87–89.

[86] D.I. 6 at 37.

[87] *See, e.g. Dayton v. Collison*, 2020 WL 3412701, at *12 (Del. Super. June 22, 2020), *aff'd* 250 A.3d 763, (Del. 2021) (holding that filming, photographing, verbal confrontations, threats of litigation, and complaints to the city did not amount to such conduct that the court would consider "go beyond all possible bounds of decency" or "utterly intolerable in civilized community").

Although I come to the same conclusion, I address separately the incident in which Mr. Narvesen drove his car at the Defendants, forcing them to jump out of the way to avoid being hit, the circumstance in which Mr. Narvesen chased the Defendants down in his car as they were exiting the development in their own vehicle while yelling at them and showing them his middle finger, and the instance in which he appears to be standing immediately outside their property in the middle of the night at the mouth of the Defendants' driveway.[88] "To be found liable for intentional infliction of emotional distress, '[i]t is not enough that a defendant acted with tortious or criminal intent, intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation that would entitle the plaintiff to punitive damages under another tort.'"[89] I acknowledge the abhorrent nature of these actions taken by Mr. Narvesen but find it does not tip the scales to such conduct that would be considered "utterly intolerable in a civilized community," as conduct can be unacceptable but not arise to the intensity and

---

[88] Tr. 95:18–96:7; Tr. 189:3–6; Tr. 175:17–176:13; Tr. 252:10–253:12; Tr. 251:16–252:7; DX U.

[89] *Rhinehardt v. Bright*, 2006 WL 2220972, at *4 (Del. Super. July 20, 2006) citing *Beckett*, 1994 WL *4 (citing *Farmer v. Wilson*, 1992 WL 331450, at *4 (Del. Super. Sept. 29, 1992)).

duration necessary to qualify as extreme and outrageous such that it is recoverable under a claim for intentional infliction of emotional distress.[90]

> **D.    I do not find that Plaintiffs have met their burden of proof in their claim against the Defendants for intrusion upon seclusion.**

The burden is on Plaintiffs to "show that [Defendants] intentionally intruded, physically or otherwise, upon [their] solitude or seclusion or his private affairs or concerns in a manner that would be highly offensive to a reasonable person."[91] "Furthermore, comment c to § 652B [of the Restatement (Second) of Torts] states, 'the defendant is subject to liability . . .  only when he has intruded into a private place or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs.' Thus, the *sine qua non* of this variety of tort of invasion of privacy is clearly *intrusion.*'"[92]

Here the Plaintiffs' claim for intrusion upon seclusion is for the Defendants security camera that they put up at the entrance to their driveway facing the Plaintiffs' Property, that they claim records activity thereon that is not readily visible

---

[90] *See Mattern*, 532 A.2d at 86 ("The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity[.]"); *see also Collins v. Afr. Methodist Episcopal Zion Church*, 2006 WL 1579718, at *3 (Del. Super. Mar. 31, 2006) (describing a case where "being grabbed and kissed by a priest against one's will involve conduct that was unacceptable, but . . . [not] extreme and outrageous").

[91] *Dayton*, 2020 WL at *10 (citing *Barker*, 610 A.2d 1341, 1350 (Del. 1992)).

[92] *Picture People, Inc.*, 2012 WL at *3 (quoting *Beckett*, 1994 WL at *5).

to the public.[93] The Defendants have recorded and taken pictures of the Plaintiffs and their property from their own cell phones and from what seems to be a single security camera that sits at the mouth of their driveway.[94] I do not find that one camera at the mouth of the Defendants' property that captures video of any individual that may be approaching the Defendants' Property for entry is an intrusion in a manner that would be considered highly offensive to the reasonable person.[95] Additionally, the area revealed in the picture of the camera is limited to the mouth of the Defendants driveway and in no way is pointed in a way that indicates any intent to film the Plaintiffs' private affairs.[96]

---

[93] D.I. 1 at ¶56–63.

[94] DX U; DX P; DX T; DX W.

[95] There are cases in Delaware in which individuals filming their neighbors have been found liable for intrusion upon seclusion, however those cases were found to be "highly offensive to the reasonable public" when they involved multiple cameras directed in such a way that they would record individuals on their property that could not be seen by the public and therefore distinct from the facts herein that have single camera that captures the mouth of the Defendants' driveway and the limited instances in which the Defendants were filming interactions with the Plaintiffs from their own cell phones. *See Williams v. Manning*, 2009 WL 960670, at *18 (Del. Super. Mar. 13, 2009) (finding that the jury's award reflected their reaction to the installation of 5 sophisticated security cameras able to capture their neighbor's normal living activities not normally visible from their home); *see also Dayton*, 2020 WL at *10 (finding that the plaintiffs intruded upon the defendant's solitude in a highly offensive manner when they installed motion activated cameras specifically noting that they were pointed toward the plaintiff's backyard and capturing not only video but audio recordings of conversations being had by the plaintiff in his backyard).

[96] *See* DX U; DX P; DX T.

**E.    The Defendants are not liable for trespass.**

In Delaware, an intentional trespass occurs when the plaintiff proves three elements: "(1)  the plaintiff must have lawful possession of  the property;  (2)  the defendant must have entered onto the plaintiff's land without consent or privilege; and (3)    the plaintiff must show damages."[97]    Questions    about    the Defendants' specific state of mind may be important for calculating damages, but the Plaintiffs need not look "'to prove that the act was done by the [Defendants] with any wrongful intent; it is sufficient if it was without justifiable cause or purpose, though it were done accidentally or by mistake.'"[98] "If the actor is and intends to be upon the particular piece of land in question, it is immaterial that he honestly and reasonably believes that he has the consent of the lawful possessor to enter, or, indeed, that he himself is its possessor."[99] "Any unlawful entry upon another's land constitutes a trespass, and the law implies damages for such a trespass, but the amount depends upon the damages actually done."[100]

The Plaintiffs claim that the Defendants committed trespass for trimming the hedge that sits on the Plaintiffs' side of the property, for blowing debris onto their

---

[97] *Kuhns v. Bruce A. Hiler Delaware QPRT*, 2014 WL 1292860, at \*19 (Del. Ch. Mar. 31, 2014) (quoting *O'Bier v. JBS Const., LLC*, 2012 WL 1495330, at \*2 (Del. Super. Apr. 20, 2012)).

[98] *Williams*, 2009 WL at \*8 (quoting *Quillen v. Betts*, 39 A. 595, 597 (Del. Super. 1897)).

[99] *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 164 cmt. a (1965)).

[100] *O'Bier*, 2012 WL at \*2 (citing *Cochran v. City of Wilm.*, 77A. 963 (Del. Super. 1909)).

property, and for installing the concrete drain onto Virginia Place.[101] The Defendants are not liable for trespass for DelDOT's installation of the drain onto Virginia Place because the state of Delaware exercised their own access rights to Virginia Place and used set aside legislative funds to provide the water management solution requested by the Defendants.[102] The Plaintiffs provided no testimony or evidence at trial to the Defendants blowing debris onto their property and therefore do not succeed in meeting their burden.

As for the claim related to the hedge trimming, I begin with the second prong that requires proof of entry without consent or privilege since I have already addressed the issue of ownership of Virginia Place above. There was testimony at trial from the Plaintiffs that the Defendants sometimes trimmed the hedges on the Plaintiffs' side of Virginia Place.[103] There were also photographs submitted of Mr. Palmer standing next to the Plaintiffs' hedges with a ruler along with pictures of a sign put up by Mr. Palmer directing how he wished the Defendants to cut the hedges in the future.[104] Mr. Palmer has limited maintenance rights within the easement as outlined in the 2009 Settlement, however these are limited in scope to the

---

[101] D.I. 1 at ¶47.

[102] Tr. 157:1–158:3; *see also* DX KK (Urbanek) Tr. 32:19–33:19.

[103] Tr. 42:11–21.

[104] PX 11.

maintenance described in the agreement.[105] The agreement does not grant Mr. Palmer the privilege of access for trimming the hedge, this is an obligation expressly granted to the Plaintiffs.[106] I therefore must find that the Plaintiffs have successfully fulfilled the second prong of unlawful and unprivileged entry.

The Plaintiffs, however, fail in the final requirement for proof of harm. The law implies damages for any unlawful entry upon another's land but for the Plaintiffs to recover they must prove harm in the form of damages and here they have not done so.[107] I therefore cannot find that Mr. Palmer is liable for trespass in this alleged instance of his trimming the hedges.

### F. I find that both parties have breached the 2009 settlement agreement.

A party will prevail on a breach of contract claim by establishing by a preponderance of the evidence: "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[108] "Settlement

---

[105] DX J at ¶4–7.

[106] *Id.* at ¶2–3 ("It is the responsibility of the [Plaintiffs] to maintain clear access over the Driveway including removing obstructions to a height of fifteen (15) feet above the surface").

[107] *See O'Bier*, 2012 WL at *2 (holding that "[s]ince the plaintiff cannot establish any damages, the defendants' motion for summary judgment is granted").

[108] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

agreements are contracts and Delaware courts examine them under well-established law surrounding contract interpretation."[109] "The primary goal in contract interpretation is to fulfill, as nearly as possible, the reasonable shared expectations of the parties at the time they contracted."[110] In interpreting the agreement I must "give priority to the parties' intentions as reflected in the four corners of the agreement[, and] interpret clear and unambiguous terms according to their ordinary meaning."[111] When a contract is rendered ambiguous such that "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[112] The Court may then look to other sources that "may render an ambiguous contract clear so that an 'objectively reasonable party in the position of either bargainer would have understood the nature of the contractual rights and duties[.]"[113]

---

[109] *Sterlin Property Holdings Inc. v. New Castle County*, 2013 WL 1821594, at *6 (Del. Ch. Jan. 28, 2013) (quoting *Schwartz v. Chase*, 2010 WL 2601608, at *4 (Del. Ch. June 29, 2010)); *see also In re Ebix, Inc. Stockholder Litigation*, 2016 WL 208402, at *12 (Del. Ch. Jan. 15, 2016) (quoting *Christiana Care Health Servs. v. Davis*, 2015 WL 6689642, at *3 n. 27 (Del. Nov. 3, 2015)) ("Delaware law favors settlements and treats them as binding contracts.").

[110] *Fox v. Paine*, 2009 WL 147813, at *5 (Del. Ch. Jan. 22, 2009) (citing *Bell Atlantic Meridian Sys. v. Octel Comm'ns Corp.*, 1995 WL 707916, at *5 (Del. Ch. Nov. 28, 1995)).

[111] *Ferry v. Eide*, 2021 WL 3930531, at *5 (Del. Ch. Aug. 25, 2021) (citing *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779-80 (Del. 2012)).

[112] *Rhone-Poulenc Basic Chems, Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[113] *United Rentals, Inc. v. RAM Hldgs, Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (quoting *U.S. West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *10 (Del. Ch. June 6, 1996)).

The parties here do not dispute the validity of the 2009 Settlement, and given it is a settlement agreement approved by this Court, neither do I.[114] The agreement states, "[t]he Parties agree not to photograph or video one another's property."[115] Both parties have been videoing and photographing one another, proven by the videos and photographs submitted for evidence in this trial, in their very existence and in their contents. The Plaintiffs installed an exorbitant amount of video cameras pointed at the Defendants' property.[116] The Defendants installed a video camera on their gatepost pointing at the Plaintiffs' property, took photographs of the Plaintiffs' property and took videos of their interactions with the Plaintiffs.[117] Both parties are in violation of this term in the 2009 Settlement to not video or photograph the other's property.

The Plaintiffs are in violation of the 2009 Settlement for failing to maintain clear access to the driveway. The 2009 Settlement states in relevant part that the Plaintiffs must "maintain clear access over the Driveway," and must trim "any vegetation up to a height of fifteen feet within the driveway each May and

---

[114] DX J; *Singer*, 297 A.2d at 442 (citing *Ezzes v. Ackerman*, 234 A.2d 444 (Del. 1967) (holding that a judicially approved settlement has the same res judicata effect of a judgment based on a trial on the merits).

[115] DX J at ¶11.

[116] DX W at 106 and 107.

[117] Tr. 168:2–5; DX P; DX R; DX W.

27

November."[118] There was no evidence presented at trial to suggest that the Plaintiffs have failed to fulfil their hedge maintenance obligations. All the same, the Plaintiffs put up barricades in Virginia Place, hindering the Defendants' and their guests access through Virginia Place and on one occasion Mr. Narvesen used his own car to physically block an internet service truck from leaving the Defendants' driveway.[119] This constitutes a failure to maintain clear access over Virginia place and therefore a breach of the 2009 Settlement.

The Defendants are in violation of the 2009 Settlement for contesting the fee ownership of Virginia Place. The Defendants agreed in the 2009 Settlement "not to contest the [Plaintiffs] fee ownership in Virginia Place." In their motion for summary judgment filed on January 3, 2025, the Defendants argue the Plaintiffs are not the owners of Virginia Place because they claim the property was transferred to the state of Delaware in 1998.[120] This is a clear attempt to relitigate the matter settled in 2009 and by contesting ownership in their motion are in breach of the 2009 Agreement.

---

[118] DX J at ¶2–3.

[119] Tr. 63:2–8; DX W at 103; DX V.

[120] D.I. 33 at ¶18–23.

**G.  Mr. Narvesen is not bound to the second agreement between his mother and the Defendants as he was not a party to the agreement.**

General contract principals state that "only a party to a contract may be sued for breach of that contract."[121] In some cases non-signatories "may later accept or adopt a contract and thus be bound by it[,]" but that must be contemplated within the contract itself and therefore the question of "whether a non-signatory can be bound to a contract through adoption is, in the first instance, a question of contract interpretation[.]"[122] Contracts for personal services yet to be rendered are terminated upon the death of either party as the death is considered an implied condition that discharges the contract.[123]

---

[121] *Smith v. Promontory Fin. Grp., LLC*, 2019 WL 5446013, at *1 (Del. Ch. Oct. 24, 2019) (citing *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002); *see also Vichi v. Koninklijke Philips Electronics N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) ("a person not a party to a contract cannot be held liable it.").

[122] *American Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 344 (Del. Ch. Jan. 30, 2003).

[123] *Du Pont v. Standard Arms Co.*, 81 A 1089, 1090 (Del. Ch. 1912) ("So it is held that the death of each party to a contract for a term of service is an implied condition of it which effected a legal termination of it, and therefore, the death of either party did not give a right against the other for damages for such termination."); *Nye v. University of Delaware*, 2003 WL 22176412, at *5 (Del. Super. Ct. Sept. 17, 2003) (holding that although the death of a party to a services contract before services are rendered may terminate a contract it does not terminate an agreement if services have already been rendered); *see also Martin v. Star Pub. Co.*, 126 A.2d 238, 242 (Del. 1956) ("The doctrine of impossibility or 'frustration' have been evolved 'from the court's sense of justice.' The classes of cases to which the rule is applicable are stated [as]… 'Impossibility due to the death or illness of one who by the terms of the contract was to do an act requiring his personal performance[.]") (internal citation omitted).

The second agreement from 2009 between the Defendants' and Genevieve Narvesen where the parties agreed that Mr. Palmer would stay off specific portions of Plaintiffs' Property and for Genevieve Narvesen to keep her son off certain portions of the Defendants' Property is no longer enforceable.[124] Genevieve Narvesens' obligation under this contract to keep her son from entering onto the Defendants' property was hers and hers alone.[125] Although Mr. Narvesen is a subject of this additional agreement, he is not a party to this agreement, nor has there been any manifestation that he ever intended to be bound by adopting the agreement, and therefore cannot be held liable for breach of contract.

## H.    The parties' request for relief in the form of equitable rescission is appropriate.

"Rescission seeks to 'unmake' or 'cancel' an agreement and to return the parties to the *status quo ante*. 'Common grounds for rescission of a contract for the sale of real property include fraud, misrepresentation and mistake.' Rescission can be sought at law or in equity."[126] "Typically, a claim for equitable rescission is based upon grounds of fraud, misrepresentation or mistake. However, there have been

---

[124] DX K.

[125] *Id.*

[126] *Kane v. NVR, Inc.*, 2020 WL 583812, at *3 (Del. Ch. Feb. 6, 2020) (quoting *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982) (footnotes omitted); *see also Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 61 (Del. 2022) ("rescission results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo").

limited cases in which courts have found that a breach of contract could support the use of equitable rescission. In those cases, courts have looked to whether there was 'an unjustified failure to perform basic terms of a contract' to warrant rescission rather than mere damages."[127] The Court of Chancery has broad discretion to award rescission where the facts and circumstances warrant.[128]

As to the requested remedy of equitable rescission, both parties expressed at trial that the 2009 Settlement is not adequately governing the relationship between the two neighbors, evidenced by the continued conflict since its enactment in 2009, and requested that the best solution is for the agreement to be declared void to allow for room for a new agreement to be entered into.[129] I agree. The parties here are engaged in what has now become a multigenerational feud and although I suspect the most well drafted agreement will still likely fall short of its goal of halting all conflict with these respective owners, the agreement presently in place is no longer, and likely has never, been sufficient at maintaining the peace between these two landowners. I therefore find that equitable rescission is appropriate to allow for a new agreement to be put into place.

---

[127] *Marina View Condo. Ass'n of Unit Owners v. Rehoboth Marina Ventures, LLC*, 2018 WL 1172581, at *6 (Del. Ch. Mar. 6, 2018) (quoting *Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del. Ch. 1958) (internal citations omitted).

[128] *Tornetta v. Musk*, 310 A.3d 430, 546 (Del. Ch. 2024) (citing *Gotham P'rs, L.P.*, 817 A.2d at 164).

[129] Tr. 387:7–388:4.

## I.	Attorneys' Fees and Costs

Delaware follows the American rule which states that "litigants are normally responsible for paying their own litigation costs."[130] An exception to this rule is the bad faith exception, requiring the party seeking fee shifting to satisfy "the stringent evidentiary burden of producing 'clear evidence' of bad faith,"[131] and generally must show that the party against whom fees are being sought engaged in "glaringly egregious" conduct.[132] "[T]he bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[133]

The parties here have a clear animosity toward one another. The record establishes conduct from both parties that this Court feels more than comfortable to define, at times, to have been abusive. However, the parties have arrived before the Court, seeking relief from the alleged harm they have inflicted upon each other, but also seeking in good faith the Court's resolution to the central issue of this case, which is the use of Virginia Place. I do not find that either party has acted in bad faith in their conduct while pursuing this litigation such that they could be said to

---

[130] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[131] *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)).

[132] *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del. Ch. July 7, 2023).

[133] *Nichols v. Chrysler Gp.*, LLC, 2010 WL 5549048, at *3 (Del. Ch. Dec. 29, 2010).

have engaged in glaringly egregious conduct that would necessitate at this time for the Court's intervention to deter abusive litigation.

## III. CONCLUSION

Virginia Place is owned by the Plaintiffs and the Defendants have rights to ingress and egress to their own property through an easement. Neither party was successful in their claims against the other for intentional infliction of emotional distress. I also do not find the Defendants liable for intrusion upon seclusion or trespass.

Both parties have engaged in conduct that constitutes breach of the 2009 Settlement, and I agree with the parties that dissolving the agreement is an appropriate remedy, however this report does not do that. I think it is best to direct the parties to meet and confer and create a proposed stipulated implementing order or competing proposed implementing orders that reflect and implement the findings from above.

I do, however, offer some guidance to the parties on my expectations for the implementing order. The proposed order should contain a solution to the issue of the Defendants' sale of their home. I recommend that includes an agreement that all parties limit their use of any security cameras and/or other recording devices to one permanent fixture on their own property and pointed generally outward at an entrance to their own property and an order for the Plaintiffs to remove all signs,

trashcans, and caution tape from Virginia Place. The proposed order should also contain long term maintenance obligations that require each party to maintain their respective sides of Virginia Place. The order should retain similar language to maintenance obligations regarding the vegetation that encroaches onto the roadway of Virginia Place but should provide an enforcement mechanism of some kind.

This is a magistrate's final report pursuant to Court of Chancery Rule 144. Barring the filing of exceptions, the parties are directed to meet and confer and, within 60 days from the entry of this report, are to either submit a stipulated joint implementing order or competing implementing orders to replace the 2009 Settlement Agreement.